**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re Application of:

PALLADIAN PARTNERS, L.P., HBK
MASTER FUND L.P., HIRSH GROUP
LLC, and VIRTUAL EMERALD
INTERNATIONAL LIMITED,

                    Petitioners,

FOR AN ORDER TO TAKE DISCOVERY
FOR USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. § 1782

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' APPLICATION AND
PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

# CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

I.     THE PARTIES ................................................................................................. 4

II.    FACTUAL BACKGROUND ............................................................................ 5

     A.     Petitioners' Obtain a €1.5 Billion Judgment Following Argentina's
          Default on the Warrants .......................................................................... 6

     B.     The Contemplated Foreign Proceedings ................................................. 7

     C.     *Viva La Libertad* & the $LIBRA Token Catastrophe ............................... 7

III.   THE REQUESTED DISCOVERY ................................................................. 14

     A.     Benjamin Chow ..................................................................................... 14

IV.   ARGUMENT ................................................................................................. 15

     A.     Petitioners Satisfy The Statutory Requirements Of 28 U.S.C. § 1782 ..... 17

         1.     Respondent Is "Found" In This District ................................... 18

         2.     The Discovery Sought Is "For Use" In Foreign Proceedings ..... 18

         3.     Petitioners Are Interested Persons ............................................ 21

     B.     All Discretionary *Intel* Factors Favor Permitting The Discovery Petitioners
          Seek ...................................................................................................... 21

         1.     The First *Intel* Factor Favors Granting Discovery ...................... 22

         2.     The Second *Intel* Factor Favors Granting Discovery.................. 22

         3.     The Third *Intel* Factor Favors Granting Discovery..................... 23

         4.     The Fourth *Intel* Factor Favors Granting Discovery................... 24

V.    CONCLUSION ............................................................................................. 25

**TABLE OF AUTHORITIES**

Page(s)

## Cases

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77 (2d Cir. 1997)........................................................17

*In re Application of financialright claims GmbH*,
2024 WL 4818177 (D. Del. Nov. 18, 2024) .......................................21

*In re Ex Parte Application of Glob. Energy Horizons Corp.*,
2015 WL 1325758 (N.D. Cal. Mar. 24, 2015) ....................................20

*In re Application of OOO Promnesfstroy*,
2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) .......................................22

*In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*,
195 F. Supp. 3d 899 (S.D. Tex. 2016) ..................................................16

*In re Application of Shervin Pishevar*,
439 F. Supp. 3d 290 (S.D.N.Y. 2020)..............................................18, 22

*In re Application of Temp. Servs. Ins. Ltd.*,
2009 WL 2843258 (W.D.N.Y. Aug. 28, 2009) .................................20

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998) ..........................................................16, 24

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012)........................................................ 16, 17, 23

*Catalyst Managerial Servs., DMCC v. Libya Africa Inv. Portfolio*,
680 F. App'x 37 (2d Cir. 2017) ..........................................................24

*In re Clerici*,
481 F.3d 1324 (11th Cir. 2007) ..........................................................20

*In re Edelman*,
295 F.3d 171 (2d Cir. 2002) ..............................................................17

*In re Escallon*,
323 F. Supp. 3d 552 (S.D.N.Y. 2018)..................................................18

*Euromepa S.A. v. R. Esmerian*,
Inc., 51 F.3d 1095 (2d Cir. 1995)..................................................17, 22

*In re Gianoli Aldunate*,
    3 F.3d 54 (2d Cir. 1993) ........................................................................... 16

*In re Hansainvest Hanseatische Inv.-GmbH*,
    364 F. Supp. 3d 243 (S.D.N.Y. 2018) ...................................................... 19

*In re Hornbeam Corp.*,
    722 F. App'x 7 (2d Cir. 2018) .................................................................. 19

*Hurlock v. Kelsier Ventures et al*,
    No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025) ...................................... 3

*Hurlock v. Kelsier Ventures et al*,
    No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025) .................................... 18

*Hurlock v. Kelsier Ventures et al*,
    No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025) ...................................... 5

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ........................................................................ *passim*

*Inv. Vehicles v. KPMG, L.L.P.*,
    798 F.3d 113 (2d Cir. 2015) ..................................................................... 21

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
    62 F. Supp. 3d 358 (S.D.N.Y. 2014) ................................................. 20, 23

*In re Letter of Request from Crown Prosecution Serv. of U.K.*,
    870 F.2d 686 (D.C. Cir. 1989) ................................................................. 19

*Linsen Int'l Ltd. v. Humpuss Sea Transp. PTE LTD*,
    2011 WL 1795813 (S.D.N.Y. Apr. 29, 2011) .................................... 20, 23

*In re Mangouras*,
    2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) .................................... 18, 19

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ............................................................. 18, 24

*In re Metallgesellschaft AG*,
    121 F.3d 77 (1997) ................................................................................... 23

*Palladian Partners, L.P. et al v. The Republic of Argentina*,
    No. 1:25-cv-01954-CKK (June 23, 2025) .................................................. 5

*In re Request for Subpoena by Ryanair Ltd.*,
    2014 WL 5583852 (N.D. Cal. Oct. 31, 2014) .......................................... 20

*Matter of Rosa Carolina Germano Dos Santos*,
  2023 WL 4993673 (D.N.J. Aug. 4, 2023) ............................................................... 19

*In re YILPORT Holding A.S.*,
  No. 22-3028, 2023 WL 2140111 (D.N.J. Feb. 21, 2023) ......................................... 19

## <u>Statutes</u>

28 U.S.C. § 1782 ......................................................................................................... *passim*

## <u>Other Authorities</u>

*The $LIBRA Affair: Tracking the Memecoin That Launched a Scandal in
  Argentina*, TRM Blog (Feb. 16, 2025),
  tinyurl.com/2pddep3s ........................................................................................... 8, 12

Amy Booth, *Milei is Already Facing Impeachment Requests and Lawsuits in
  $LIBRA Crypto Scandal*, Buenos Aires Herald (Feb. 17, 2025),
  tinyurl.com/yer38kj6 ................................................................................................ 13

Ankish Jain*, LIBRA's Collapse Becomes Solana's Biggest Scandal Since FTX:
  How Jupiter and Meteora Left Retail Rekt* (Feb. 20, 2025),
  tinyurl.com/ysfu9hyk ......................................................................................... 10, 11

Ben Chow*, Ben Chow - New York*, About.me,
  tinyto.me/_ulp_QV .................................................................................................... 5

Ben Chow, *LinkedIn* (last visited July 31, 2025),
  tinyurl.com/26r6d7tv ............................................................................................ 5, 9

Ben Chow, *Meteora Governance Summary*, Meteora,
  tinyto.me/hTND_Vw ................................................................................................ 14

Ben Chow, *Size Matters: How Meteora Will Multiply Solana's TVL*, Solana
  Compass (Dec. 5, 2023),
  tinyto.me/-YOM_tA ....................................................................................... 3, 10, 12

Ben Weiss, *Argentina Seeks Arrest of U.S. Crypto Figure Tied to Melania and
  Milei cryptocurrencies*, Fortune (March 13, 2025),
  tinyurl.com/4vr4yw4w ............................................................................................. 13

benchow.sol (@hellochow), X (Feb. 16, 2025, 11:18 PM),
  tinyurl.com/yv5rr896 ........................................................................................... 5, 15

Buenos Aires Times, *Milei shutters office investigating 'cryptogate' $LIBRA
  scandal*, (May 20, 2025),
  tinyurl.com/3usxmcb8 .............................................................................................. 13

Carol Goforth, *The Lawyer's Cryptionary: A Resource for Talking to Clients About Crypto-Transactions*, 41 Campbell L. Rev. 47 (2019) ..................................................... 8

*Co-Founder of Crypto Firm Behind Trump, Melania Tokens Resigns Amid Insider Trading Allegations, Decrypt* (Feb. 18, 2025), tinyto.me/3-0V_RS ................................................................................ 8

Hugo Alconada Mon, *Milei aparece ligado a otro negocio cripto con personajes en común al caso $LIBRA*, LA NACIÓN, (Feb. 25, 2025), tinyurl.com/msparssf ............................................................................... 8

Landon Manning, *How Solana Meme Coin Snipers on Pump.fun Manipulate Markets*, BEINCRYPTO (Apr. 21, 2025), tinyurl.com/2udvfcnk ................................................................................ 2

meow (@weremeow), X (Feb. 17, 2025), tinyurl.com/bmwuykdh ..............................................................................5, 14

Meteora, *2% DAO Stimulus Proposal, Medium* (July 26, 2025, 1:26 PM), tinyurl.com/24fznrdu ............................................................................... 9

*Meteora Co-Founder Ben Chow Resigns Amid LIBRA Memecoin Controversy*, DEFI PLANET (Feb. 18, 2025), tinyurl.com/26r6d7tv ............................................................................... 5

Meteora Documentation, tinyto.me/GHNR_2i ................................................................................ 5

Meteora Governance Forum, *User Profile: ben*, https://tinyurl.com/52jrnc8a ......................................................................... 9

Meteora Website Documentation, *What's DAMM v2?*, tinyto.me/GGI__SI ........................................................................10, 11

Meteora *Overview* (last visited Jul 28 2025), tinyurl.com/3z2ehse3 ............................................................................... 10

Omkar Godbole, *LIBRA Memecoin Fiasco Destroyed $251M in Investor Wealth, Research Shows*, COINDESK (Feb. 20, 2025), tinyurl.com/tmh4zj6t .............................................................................. 12

Camil Dolabjian, *El creador de $LIBRA alardeaba "controlar" a Javier Milei y de haber pagado sobornos en la Argentina*, La Nación (Feb. 18, 2025), tinyurl.com/yfz3j673 .............................................................................. 13

Solana Floor (@SolanaFloor), X (Feb. 17, 2025 6:43 PM), tinyto.me/gCYg_d9 ............................................................................... 12

*Statement From Kip On $Libra Launch*, Kip Protocol (Feb. 24, 2025),
tinyurl.com/yc47c7zp ................................................................................. 13

TodoNoticias, *Javier Milei En ¿La Ves? - Entrevista Completa Del 17/02/2025*,
YouTube (Feb. 17, 2025),
tinyurl.com/j5pkhbn9 ................................................................................ 13

TRM Labs, *The $LIBRA Affair: Tracking the Memecoin that Launched a Scandal
in Argentina* (Feb. 16, 2025),
tinyurl.com/2pddep3s ................................................................................... 2

Vismaya V*, Co-Founder of Crypto Firm Behind Trump, Melania Tokens Resigns
Amid Insider Trading Allegations*, Decrypt (Feb. 18, 2025),
tinyurl.com/2m5fy7h8 ............................................................................... 14

voidzilla, *the LIBRA Interview*, YOUTUBE (Feb. 16, 2025),
tinyurl.com/56pyhwm4 .............................................................. 2, 3, 8, 10, 11

YouTube, *Meteora AG - Official Channel*,
tinyurl.com/5c8uyx3j ................................................................................ 10

Zameer Attar, *Interpol-Wanted Scammer Hayden Davis Exposed in $40M WOLF
Crypto Rug Pull*, Coinpedia (March 17, 2025),
tinyurl.com/yc2886xp ................................................................................ 13

Petitioners Palladian Partners, L.P., HBK Master Fund L.P., Hirsh Group LLC, and Virtual Emerald International Limited (collectively, "Petitioners") respectfully submit this Memorandum of Law in support of their Application and Petition Pursuant to 28 U.S.C. § 1782 ("the Application"), for an order authorizing them to obtain discovery from Benjamin Mark Chow ("Respondent" or "Chow") in the form of the attached subpoena *duces tecum* (the "Subpoena").[1]

## PRELIMINARY STATEMENT

Petitioners bring this Application for the purpose of obtaining targeted and necessary discovery in aid of a contemplated action in London, England, and possibly elsewhere, to enforce an over EUR 1.5 billion judgment (the "Judgment") awarded against the Republic of Argentina ("Argentina") on June 9, 2023 by London's High Court of Justice, King's Bench Division, Commercial Court, in London, England (the "High Court"). Petitioners commenced an action in the High Court seeking to recover unpaid amounts due to all warrant holders of the Euro-denominated securities (trading under ISIN XS0209139244) issued by Argentina in 2005 and 2010 and linked to Argentina's gross domestic product ("GDP") (collectively, the "GDP Warrants" or the "Securities"). Petitioners' Judgment became final on October 14, 2024, when the Supreme Court of the United Kingdom refused Argentina's application to file a further appeal. Petitioners now intend to pursue enforcement against Argentina in the High Court, and potentially elsewhere, to recover the still outstanding balance of the Judgment, amounting to EUR 1,543,508,749.15 (the "Foreign Proceedings").[2] Consequently, Petitioners seek proportional discovery from Respondent

---

[1]  The Subpoena is attached as Ex. 1 to the Declaration of Odysseas Repousis, dated August 4, 2025 ("Repousis Decl.").

[2]  The Declaration of Aidan O'Rourke, dated August 4, 2025 ("O'Rourke Decl."), sets forth the procedural history and current status of Petitioners' EUR ~1.5 billion judgment against Argentina,

to aid in the development and execution of their enforcement strategy against the Republic in the contemplated Foreign Proceedings.

Petitioners seek discovery from Respondent Chow to obtain information within his possession, custody, or control concerning the rise and fall of the $LIBRA token—a "memecoin" promoted by Argentina's President Javier Milei and developed by cryptocurrency entrepreneur Hayden Davis ("Davis") through his firm Kelsier Labs LLC ("Kelsier Labs") with the aid of President Milei, and launched in the Meteora platform.  President Milei touted $LIBRA's transformative potential for Argentina's economy and publicly legitimized the coin, lending his official credibility to the coin's value and causing investors to rush in.  Yet, within hours of its launch, $LIBRA's value spiked and collapsed, prompting widespread accusations of a "pump-and-dump" or "rug pull" fraud scheme.  Davis, alongside his frequent launch partner, Benjamin Chow, is reported to have deployed a strategy that involves using high-profile endorsements to smokescreen one-sided liquidity pools and automated 'sniping' systems (or 'bots')—that allow insiders to monopolize token supply from the moment of launch.  These undisclosed advantages ensure that retail traders enter a fundamentally rigged market, where the launch team and its related parties have already secured control over price and liquidity dynamics. [3]  By Davis's own

identifies the critical enforcement-related information in Respondent's possession, and explains the admissibility of Section 1782 discovery in English proceedings.
[3]    *See* voidzilla, *the LIBRA Interview*, YOUTUBE (Feb. 16, 2025), tinyurl.com/56pyhwm4, at 18:30-25:00 (discussing sniping practices on $LIBRA and other meme coins); *see also* Landon Manning, *How Solana Meme Coin Snipers on Pump.fun Manipulate Markets*, BEINCRYPTO (Apr. 21, 2025), tinyurl.com/2udvfcnk (revealing systematic sniping affecting "over 15,000 token launches" where developer-funded wallets "purchase tokens in the very first block and then liquidate almost immediately—85% within five minutes" which creates "the appearance of immediate demand" while "giving developers an unfair advantage"); *see also* TRM Labs, *The $LIBRA Affair: Tracking the Memecoin that Launched a Scandal in Argentina* (Feb. 16, 2025),

admission, a substantial amount of Argentina's money—reportedly "$110 million"—remains in his possession.[4, 5]

Chow is a co-founder of Meteora, which is a decentralized cryptocurrency exchange. The relevant $LIBRA trades were executed on *Meteora.ag,* the Meteora platform. Chow exercised comprehensive control over Meteora's operations and strategic direction, including concerning the $LIBRA launch. As Meteora's Co-Founder, he not only developed and proposed fee structures and policies for Meteora's trading platform but also spoke authoritatively about these mechanisms, positioning himself as the public face of the exchange.[6] Chow's control extended to all aspects of Meteora's decentralized exchange operations, including the critical infrastructure that would later facilitate the manipulative token distributions at issue.[7] Due to Chow's prominent involvement

---

tinyurl.com/2pddep3s (documenting how "approximately twenty minutes before President Milei's tweet one address received one million $LIBRA tokens" and showing USD 7.8 million extracted from Meteora pools).

[4] voidzilla, *the LIBRA interview*, YouTube (Feb. 16, 2025), tinyurl.com/56pyhwm4, at 5:58–6:09; 39:45–40:25; 44:15–20; 44:28–36 ("Q: How much money do you all have sitting on the sidelines? A: No, no, no, it's, it's it's like more or less one hundred mill … probably like eleven million or so in tokens, and like 13 in fees. … so let's say like 110ish million, right, of cash … [I]t's a plan gone miserably wrong, with $100 million sitting in an account that I'm the custodian of.");

[5] *See Hurlock v. Kelsier Ventures et al*, No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 19 (granting a temporary restraining order for all $LIBRA proceeds in Defendants' control, including Davis's accounts at Circle); *see also* Repousis Decl., Ex. 2 (July 1, 2025 Hr'g Tr.) at 10:8–17 ("One of the permissible uses that we'd like to have—that would be him using these coins—would be for him to utilize them for their intended purpose, which is to benefit Argentinian businesses.").

[6] *See* Ben Chow, *Size Matters: How Meteora Will Multiply Solana's TVL*, SOLANA COMPASS (Dec. 5, 2023), tinyto.me/-YOM_tA (describing a podcast in which Chow explains Meteora's fee structures, including the Dynamic Liquidity Market Maker's dynamic fee system that "increase[s] as the price volatility increases," positioning Chow as the authoritative voice on Meteora's mechanisms throughout the detailed technical discussion of the platform's features and strategies).

[7] See Ben Chow, *Size Matters: How Meteora Will Multiply Solana's TVL*, SOLANA COMPASS (Dec. 5, 2023), tinyto.me/-YOM_tA (Chow demonstrating comprehensive knowledge of all aspects of Meteora's operations, including the Dynamic Liquidity Market Maker system, lending aggregator infrastructure, composability features, and risk assessment capabilities).

during the time the $LIBRA trades took place, Chow is likely to have substantial knowledge and records concerning the $LIBRA trades, including communications involving Hayden Davis and $LIBRA coin's launch, as well as banking information and/or crypto-currency accounts that contain $LIBRA proceeds.

This Application meets the requirements to seek discovery for use in foreign proceedings pursuant to Section 1782. Respondent Chow resides in New York City and is thus "found" in the Southern District of New York. The discovery sought by Petitioners—the production of $LIBRA transaction records, correspondence with $LIBRA insiders, and a related deposition—is directly relevant to the issues at stake in the Foreign Proceedings. Moreover, as explained fully below, each of the discretionary factors laid out by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004), favors granting discovery in this matter. Accordingly, Petitioners respectfully request that the Court grant their Application, permit them to serve the Subpoenas on Respondent Chow, and to pursue the requested discovery and deposition.

## I.    THE PARTIES

*Petitioners*.  Petitioners are beneficial owners of the GDP Warrants seeking to enforce the Judgment against Argentina in the High Court and beyond.  **Palladian Partners, L.P.** is a limited partnership organized under the laws of the Cayman Islands, located at One Nexus Way Camana Bay, Grand Cayman, Cayman Islands KY1-9005, Cayman Islands.  **HBK Master Fund L.P.** is a limited partnership organized under the laws of the Cayman Islands, located at P.O. Box 10008, Willow House, Cricket Square, George Town, KY1-1001, Cayman Islands.  **Hirsh Group LLC** is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.  Its sole member is Kenneth Hirsh, an individual residing in the

State of New York.  **Virtual Emerald International Limited** is a company organized under the laws of the British Virgin Islands, located at Craigmuir Chambers, Road Town, Tortola, VG 110, British Virgin Islands.

  ***Benjamin Chow***. Chow is the Co-Founder of Meteora and recently served as its Chief Executive Officer.[8]  Chow controlled and operated Meteora during the relevant period.[9]  Meteora is a decentralized autonomous organization, operating on the Solana blockchain where $LIBRA trades were executed.[10]  Chow operated and controlled Meteora throughout the relevant period from New York City, where he is domiciled.[11]

## II. FACTUAL BACKGROUND

  Petitioners hold an approximate €1.5 billion judgment against the Republic of Argentina arising from the Republic's sale, and subsequent default, on GDP-linked Warrants sold under the terms of a 2005 Indenture Agreement (as amended in 2010).  Petitioners' Judgment is final and enforceable in the United Kingdom, and Petitioners have commenced recognition proceedings in the United States.[12]  As set forth in the Declaration of Petitioners' Foreign Counsel, Aidan O'

---

[8] *See* Ben Chow*, Ben Chow - New York*, About.me, tinyto.me/_ulp_QV (last visited July 31, 2025); *see also* Ben Chow, *LinkedIn,* tinyurl.com/56htf9xs (last visited July 31, 2025); *see also Meteora Co-Founder Ben Chow Resigns Amid LIBRA Memecoin Controversy*, DEFI PLANET (Feb. 18, 2025), tinyurl.com/26r6d7tv.

[9] *See* benchow.sol (@hellochow), X (Feb. 16, 2025, 11:18 PM), tinyurl.com/yv5rr896. (explaining Meteora's role and denying receipt of tokens); *see also* meow (@weremeow), X (Feb. 17, 2025), tinyurl.com/bmwuykdh (denying insider trading and announcing independent investigation).

[10] *See* Meteora Documentation, tinyto.me/GHNR_2i (last visited July 23, 2025) (Meteora webpages describing platform features).

[11] *See Hurlock v. Kelsier Ventures et al*, No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 1-2 (Ex. B – Affirmation of Service).

[12] *See Palladian Partners, L.P. et al v. The Republic of Argentina*, No. 1:25-cv-01954-CKK (June 23, 2025).

Rourke, Petitioners require the requested discovery to aid in the development and execution of their asset recovery within the United Kingdom and, possibly, other appropriate jurisdictions.

**A.    Petitioners' Obtain a €1.5 Billion Judgment Following Argentina's Default on the Warrants**

The Petitioners' claims arise from Argentina's historic sovereign debt default and subsequent restructuring. In December 2001, Argentina defaulted on its external debt, leading to a comprehensive restructuring of those obligations. In 2005 and 2010, Argentina made exchange offers to its creditors, offering GDP-linked securities as consideration for participating in the restructuring.[13] These securities represented a significant reduction from the face amount of the defaulted bonds—participating creditors received approximately 25% to 30% of the value of their original claims.[14] However, the securities provided for additional contingent payments based on the performance of the Argentine economy through 2034, effectively giving creditors a stake in Argentina's future economic growth.[15]

On December 15, 2014, Argentina failed to make payment under the Securities for the year 2013, contending that one of the contractual conditions for payment was not met as a result of the country's change in methodology for calculating its GDP.[16] On August 9, 2019, Petitioners Palladian, HBK, and Hirsh commenced proceedings in the High Court of England and Wales by filing a Claim Form against Argentina and the Bank of New York Mellon as Trustee.[17]

---

[13]  *See* O'Rourke Decl. ¶¶ 8-9 (describing the terms of sale of the Warrants).
[14]  *Id.* ¶ 9.
[15]  *Id.* ¶ 9.
[16]  *Id.* ¶ 10.
[17]  *Id.* ¶ 12; On December 11, 2019, the Petitioners filed an Amended Claim Form adding Virtual Emerald International Limited to the proceedings. *Id.* ¶ 14.

High Court awarded Petitioners a complete victory on their claims, and on June 9, 2023, entered judgment requiring Argentina to pay €1,329,760,063.39 (the 2013 Payment Amount) plus €233,220,560.34 in pre-judgment interest, as well as €64,311,645.07 to the Petitioners for costs consequences under England's Part 36 settlement rules, for a total judgment of €1,627,292,268.80 plus post-judgment interest at 2% above EURIBOR.[18]  The judgment became final on October 14, 2024, when the UK Supreme Court refused Argentina's application for permission to appeal.[19]

### B.    The Contemplated Foreign Proceedings

Now that Petitioners have a final, unappealable Judgment, they intend to pursue enforcement of the Judgment against Argentina in the United Kingdom and elsewhere to recover the outstanding debt from the GDP Warrants.[20]  To that end, Petitioners seek this Court's assistance in identifying the provenance, custody, and location of Argentine assets that stem from the $LIBRA catastrophe, as these may be available for satisfaction of the Judgment via Petitioners Foreign Proceedings.[21]

### C.    *Viva La Libertad* & the $LIBRA Token Catastrophe

Petitioners have identified the $LIBRA proceeds as possible Argentine assets that may be seized to satisfy the approximately $2 billion Judgment.  Petitioners understand that Argentina is the beneficial owner of assets generated by the launch of the $LIBRA token, a digital asset whose proceeds were intended to directly fund small business development initiatives and the digitization of the Argentine economy.  The seeds of the $LIBRA launch were first planted in July 2024, when

---

[18]   *Id.* ¶ 16.
[19]   *Id.* ¶¶ 25-26.
[20]   *See id.* ¶¶ 33, 34-39 (describing Petitioners' enforcement objectives and affirming the admissibility of the requested discovery).
[21]   *See id.*

President Milei invited Hayden Davis and other $LIBRA associates to meet with him at the Casa Rosada (the official workplace of the President).[22]  Over the next several months, President Milei and Davis would develop and finalize the details of the $LIBRA token and the *Viva La Libertad* initiative.

As President Milei explained in his February 14, 2025 launch post on X: "[t]his private project will be dedicated to encouraging the growth of the Argentine economy by funding small Argentine businesses and startups[.]" President Milei's post included a link to *VivalaLibertadProject.com*, the launch and promotional page for the $LIBRA project, and the unique contract ID for the $LIBRA token.[23]  He concluded: "The world wants to invest in Argentina."[24]

In an interview, Davis identified the key parties involved in the $LIBRA token launch: he was the "Launch Strategist,"  Meteora—directed by Respondent Chow—acted as the digital marketplace for $LIBRA trading, and Julian Peh, through his firm KIP Protocol, Inc., was to manage the reinvestment of $LIBRA proceeds in Argentina.[25]  $LIBRA was only the latest project in a long series of collaborations between Davis and Chow, including their work on $MELANIA, $M3ME, and other coins.[26]

---

[22]  Hugo Alconada Mon, *Milei aparece ligado a otro negocio cripto con personajes en común al caso $LIBRA*, LA NACIÓN,  (Feb. 25, 2025), tinyurl.com/msparssf.

[23]  *See generally* Carol Goforth, *The Lawyer's Cryptionary: A Resource for Talking to Clients About Crypto-Transactions*, 41 Campbell L. Rev. 47 (2019) (cataloguing the various forms of digital assets and their infrastructure in a "cryptionary").

[24]  *See The $LIBRA Affair: Tracking the Memecoin That Launched a Scandal in Argentina*, TRM Blog (Feb. 16, 2025), tinyurl.com/2pddep3s.

[25]  voidzilla, *supra* note 4.

[26]  *Co-Founder of Crypto Firm Behind Trump, Melania Tokens Resigns Amid Insider Trading Allegations, Decrypt* (Feb. 18, 2025), tinyto.me/3-0V_RS.

Meteora is a decentralized finance platform that operates on the Solana blockchain. The Meteora platform runs on a protocol (software) that is governed by a decentralized autonomous organization ("DAO"). The DAO is composed of governance token owners, who propose and vote on measures that run the Meteora protocol.[27] The protocol is what executes the platform's functions. Critical governance decisions were overseen by the Meteora council, which, based on public governance infrastructure and user permissions, was composed of core Meteora team members. On information and belief, Ben Chow—who has consistently described himself as a co-founder of Meteora—was a member of that core team. Chow's leadership role is publicly substantiated in multiple ways. First, he continues to identify himself as a co-founder of Meteora on his LinkedIn profile, despite the company's more recent efforts to distance itself from him following the $LIBRA fallout.[28] Second, Chow was one of only two users granted a "leader badge" on Meteora's governance platform, proposals.meteora.ag, which is reserved for community members elevated to "trust level 4" by staff and endowed with extensive administrative permissions—including the ability to edit all posts and moderate governance threads by pinning, closing, splitting, or merging discussions.[29] According to the site, Chow's account remained active through May 21, 2025, and his public profile page confirms he last posted on November 19, 2024. Finally, Chow was publicly visible in Meteora-hosted YouTube videos where he introduced himself as "one of the co-founders of Meteora," including during recorded governance and

---

[27] Meteora, 2% DAO Stimulus Proposal, *Medium* (July 26, 2025, 1:26 PM), tinyurl.com/24fznrdu (explaining that the DAO votes on quarterly token distribution)

[28] *See* LinkedIn, *Ben Chow*, tinyurl.com/56htf9xs (last accessed July 31, 2025).

[29] Meteora Governance Forum, *User Profile: ben*, https://tinyurl.com/52jrnc8a

protocol discussion calls.[30] Chow also made public appearances on the "lightspeed" crypto podcast, identifying himself as a co-founder, of Meteora.  In an episode aired on December 5, 2023, Chow talked about the project's origins, functionality, core objectives, and long-term vision.  Notably, throughout the interview, Chow spoke in the first person, signaling his direct involvement and control over Meteora.[31]

Chow's involvement with the $LIBRA launch and subsequent debacle becomes apparent when examining the technical mechanisms employed, in particular, the platform's liquidity pools. Liquidity pools are the backbone of decentralized finance because they hold the assets that enable token trading.[32]  Traditional liquidity pools are funded with equal values of two types of tokens (usually, one of the tokens is a stable asset such as SOL or USDC, pegged to a traditional currency, like the U.S. dollar), as tokens are traded, the ratio of the two tokens in the pool defines the token's price.  Meteora's Dynamic Liquidity Market Maker (DLMM) pools were not standard decentralized finance tools but rather single-sided liquidity pools susceptible to manipulation.[33]

---

[30]   *See generally* YouTube, *Meteora AG – Official Channel*, tinyurl.com/5c8uyx3j (all last visited July 31, 2025).

[31]   *See* Ben Chow, *Size Matters: How Meteora Will Multiply Solana's TVL*, SOLANA COMPASS (Dec. 5, 2023), tinyto.me/-YOM_tA (describing a podcast in which Chow explains Meteora's fee structures, including the Dynamic Liquidity Market Maker's dynamic fee system that "increase[s] as the price volatility increases," positioning Chow as the authoritative voice on Meteora's mechanisms throughout the detailed technical discussion of the platform's features and strategies).

[32]   Meteora, *Overview* (last visited Jul. 28, 2025), tinyurl.com/3z2ehse3.

[33]   *See* Meteora Website Documentation*, What's DAMM v2?,* tinyto.me/GGI__SI (explaining Meteora's "single-sided liquidity pools" option)*; see also voidzilla,* tinyurl.com/56pyhwm4, at 12:55-13:10 (Davis admitting "there's an unfair advantage if you're a genius on the chain and you know how to game the system on Meteora"); *see also* Ankish Jain*, LIBRA's Collapse Becomes Solana's Biggest Scandal Since FTX: How Jupiter and Meteora Left Retail Rekt,* CRYPTO.NEWS (Feb. 20, 2025), tinyurl.com/ysfu9hyk (analyzing how Meteora's features enabled manipulation in the LIBRA token launch).

Meteora retained centralized authority over key aspects of its decentralized trading infrastructure, including the ability to modify smart contract behavior post-deployment. As a result, Meteora's core contributors—including Chow—possessed the technical means to alter trading costs, liquidity incentives, and transaction economics across all supported pools by pushing contract upgrades through a central control structure.[34] As Chow himself acknowledged in his February 16, 2025 statement, Meteora's systems contained "an incredible number of configuration options" that he "personally provide[d] tech support for," demonstrating his intimate knowledge of and control over these manipulation mechanisms.[35] Because of this, Meteora's system allowed Davis and other insiders to launch tokens with single-sided liquidity, this is, without paring the launched token to a stable asset—essentially creating artificial scarcity and inflated valuations from inception.[36]

Chow, as the architect and operator of the platform that structured these liquidity pools, necessarily understood their capacity for manipulation, which is made clear by his public statements on the issue, including that the total value locked "TVL", (the total amount of assets in

---

[34] *Id.*

[35] benchow.sol (@hellochow), Status update, X (Feb. 16, 2025, 11:18 PM), tinyurl.com/yv5rr896.

[36] *See* Meteora Website Documentation, *What's DAMM v2?,* tinyto.me/GGI__SI(explaining Meteora's "single-sided liquidity pools" option)*; see also voidzilla,* tinyurl.com/56pyhwm4, at 12:55-13:10 (Davis admitting "there's an unfair advantage if you're a genius on the chain and you know how to game the system on Meteora"); *see also* Ankish Jain*, LIBRA's Collapse Becomes Solana's Biggest Scandal Since FTX: How Jupiter and Meteora Left Retail Rekt,* CRYPTO.NEWS (Feb. 20, 2025), tinyurl.com/ysfu9hyk (analyzing how Meteora's features enabled manipulation in the LIBRA token launch).

USD equivalent deposited in DeFi protocols) on Solana *can* and *is* "gamed",[37] despite his subsequent attempts to distance himself from the scandal.[38]

Chow's intimate involvement in the $LIBRA scheme was further exposed through leaked communications. A prominent $LIBRA insider, DeFi Tuna founder @CavemanDhirk, confronted Chow with his involvement with Davis, including with the $LIBRA, $MELANIA, $M3ME coins. During this conversation, which was leaked on X (formerly Twitter) shortly after the launch, Chow revealed his deep integration with Davis's operations. The leaked footage, demonstrated that Chow was not merely a passive infrastructure provider, but an active participant who knew the Davis family intimately, and understood and enabled Davis's market manipulation strategies across multiple token launches, including token launches that predated the $LIBRA launch.[39] This conversation exposes Chow's subsequent claims of ignorance as knowingly false.

Shortly after Milei's announcement, $LIBRA received significant inflows, raising its market capitalization to roughly $4.5 billion. However, "within hours, $LIBRA imploded," losing 89% of its value, and allegedly causing investors approximately $251 million in losses.[40] The fallout from the $LIBRA token was swift, immediately leading to calls for President Milei's

---

[37]   *See* Ben Chow, *Size Matters: How Meteora Will Multiply Solana's TVL*, Solana Compass (Dec. 5, 2023), tinyto.me/-YOM_tA

[38]   *See* benchow.sol (@hellochow), X (Feb. 16, 2025, 11:18 PM), tinyurl.com/yv5rr896. (explaining Meteora's role and denying receipt of tokens)

[39]   *See* Solana Floor (@SolanaFloor), X (Feb. 17, 2025 6:43 PM), tinyto.me/gCYg_d9 (documenting Chow's admission "I was involved in the Melania one"; @CavemanDhirk reporting that Davis "many times would get on a call with you or . . . text you and he'd . . . say oh Ben said this Ben said that . . . Ben said it's launching this Ben said he's gonna tweak"; Chow acknowledging "I make connections, right? . . . And the Melania team, you know, needed help with stuff, made connections with Hayden"; Chow later admitting "I fucked up because I enabled the guy I should not have enabled. I'm going to stop. I'm going to have to step down").

[40]   *See The $LIBRA Affair*, *supra* n.24; Omkar Godbole, *LIBRA Memecoin Fiasco Destroyed $251M in Investor Wealth, Research Shows*, Coindesk (Feb. 20, 2025), tinyurl.com/tmh4zj6t.

impeachment and accusations that he and Davis had operated a rug pull or pump-and-dump scheme.[41] Since the $LIBRA coin's debacle, President Milei has repeatedly rejected his intimate association with the project,[42] as has KIP Protocol.[43] And Davis, seemingly undeterred by an Argentine prosecutor's request of an Interpol Red Notice seeking his arrest,[44] facilitated the launch of the $WOLF meme coin, another alleged rug pull scheme launched with the "Wolf of Wall Street" Jordan Belfort that precipitated an additional $40 million in investor losses.[45] Meanwhile, President Milei currently faces a criminal proceeding regarding his cryptocurrency dealings in Argentina.[46]

Chow, on the other hand, attempted to distance himself from the scandal through a series of defensive tweets.[47] However, his statements, possibly inadvertently, confirmed Meteora's central role. Chow admitted that Meteora had verified $LIBRA's token contracts prior to launch,

[41] Amy Booth, *Milei is Already Facing Impeachment Requests and Lawsuits in $LIBRA Crypto Scandal*, Buenos Aires Herald (Feb. 17, 2025), tinyurl.com/yer38kj6.

[42] TodoNoticias, *Javier Milei En ¿La Ves? - Entrevista Completa Del 17/02/2025*, YouTube (Feb. 17, 2025), tinyurl.com/j5pkhbn9 (pinning the blame on Davis and the other investor developers of LIBRA).

[43] *Statement From Kip On $Libra Launch*, Kip Protocol (Feb. 24, 2025), tinyurl.com/yc47c7zp.

[44] Ben Weiss, *Argentina Seeks Arrest of U.S. Crypto Figure Tied to Melania and Milei cryptocurrencies*, Fortune (March 13, 2025), tinyurl.com/4vr4yw4w.

[45] Zameer Attar, *Interpol-Wanted Scammer Hayden Davis Exposed in $40M WOLF Crypto Rug Pull*, Coinpedia (March 17, 2025), tinyurl.com/yc2886xp.

[46] *See* Buenos Aires Times, *Milei shutters office investigating 'cryptogate' $LIBRA scandal*, (May 20, 2025), tinyurl.com/3usxmcb8; *see also* Camila Dolabjian*, El creador de $LIBRA alardeaba "controlar" a Javier Milei y de haber pagado sobornos en la Argentina*, La Nación (Feb. 18, 2025), tinyurl.com/yfz3j673.

[47] *See e.g.* benchow.sol (@hellochow), X (Feb. 16, 2025, 11:18 PM), tinyurl.com/yv5rr896 (explaining Meteora's role and denying receipt of tokens).

contradicting any claim of being an unwitting service provider.  His co-founder 'meow' similarly acknowledged hiring "an independent 3rd party" to investigate.[48]

Within days of these revelations, Chow resigned as CEO of Meteora.[49]

## III.    THE REQUESTED DISCOVERY

To assist in determining the actual identity of the individuals who controlled the digital asset wallets that withdrew their assets from $LIBRA precipitating its collapse, and the ultimate destination of those wallets likely containing proceeds belonging to Argentina, Petitioners seek discovery from Respondent Chow.  Respondent Chow is believed to possess highly material information that will aid Petitioners in discovering Argentine assets both within and outside of the United Kingdom.  Such information is critical for Petitioners because it would permit Petitioners to file their judgment enforcement motion against Argentina in the High Court and elsewhere.

### A.    Benjamin Chow

Chow is a co-founder and former CEO of Meteora.  Chow operated and controlled Meteora from New York City, where it is believed he resides.  Chow developed and proposed policies according to which Meteora's limited partners would earn profits.[50]  Chow also wrote authoritatively about Meteora's fee structure on the platform's website.[51]  As discussed earlier, Meteora provides the exchange where users trade digital assets, such as the $LIBRA token.

---

[48]  *See* meow (@weremeow), X (Feb. 17, 2025), tinyurl.com/bmwuykdh (denying insider trading and announcing independent investigation).

[49]  Vismaya V, *Co-Founder of Crypto Firm Behind Trump, Melania Tokens Resigns Amid Insider Trading Allegations*, Decrypt (Feb. 18, 2025), tinyurl.com/2m5fy7h8.

[50]  Ben Chow, *Meteora Governance Summary*, Meteora, tinyto.me/hTND_Vw (last visited July 16, 2025).

[51]  *Id.*

Chow, as a co-founder of Meteora, has critical information relevant to the anticipated judgment-enforcement proceedings. Chow's admitted pre-launch knowledge of the token contracts and his subsequent resignation amid criminal investigations in Argentina, strongly suggest that discovery will reveal critical evidence about the location and control of assets belonging to Argentina and ultimately to Petitioners as judgment creditors.

Petitioners seek targeted discovery from Chow, including: (1) all documents and correspondence involving Hayden Davis, Gideon Davis, Charles "Tom" Davis, President Jaiver Milei, Karina Milei, Mauricio Novelli, Manuel Godoy, Julian Peh, KIP Protocol, and/or any Meteora or Jupiter personnel; (2) all documents/information regarding any fees, if any, he received (personally or on behalf of Meteora), from the $LIBRA launch; (3) the current location of any cryptocurrency wallets and/or fiat currency in his possession associated with the $LIBRA launch; (4) all transaction records of $LIBRA on the Meteora Exchange. In conjunction with a documentary subpoena, Petitioners also seek to depose Chow.

## IV. ARGUMENT

Section 1782 of Title 28 of the United States Code permits United States District Courts to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782.

Such applications are based on "modest prima facie elements" to effectuate "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) ("[T]he statute has, over the years, been given 'increasingly broad applicability.'" (citing *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993)).

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn*, 673 F.3d at 80.

After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264–65 (2004); *In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*, 195 F. Supp. 3d 899, 902 (S.D. Tex. 2016).

Moreover, courts in this Circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international

litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995) (citation omitted); *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) (reversing denial of Section 1782 discovery where district court failed to consider statute's twin aims and instead improperly focused on whether discovery would be available under German law).

Both the Supreme Court and the Second Circuit have acknowledged a congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("In pursuit of these twin goals, the statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly[.]").

### A.  Petitioners Satisfy The Statutory Requirements Of 28 U.S.C. § 1782

Petitioners satisfy the three statutory requirements of Section 1782: (1) Respondent is "found" in the District of New York; (2) the requested $LIBRA Records are for use in the contemplated Foreign Proceedings; and (3) Petitioners are "interested persons" as the lead Claimants in those Foreign Proceedings.

### 1. Respondent Is "Found" In This District

Respondent Chow resides or is found in this district because he is a resident of New York.[52] *See, e.g.*, *In re Application of Shervin Pishevar*, 439 F. Supp. 3d 290, 301 (S.D.N.Y. 2020) (holding statutory requirement satisfied where discovery was sought from "a resident of New York").

Under the established standard in this district, Section 1782's "resides in" requirement "does not require that the respondent be 'domiciled' in the district," but rather requires that "the home be the person's established abode at the time of service, with some degree of permanent occupancy." *In re Escallon*, 323 F. Supp. 3d 552, 557 (S.D.N.Y. 2018). Chow satisfies this standard as he lives in New York City—where he operated and controlled Meteora throughout the relevant period—and where he was successfully served with process.[53]

Accordingly, this statutory factor is satisfied.

### 2. The Discovery Sought Is "For Use" In Foreign Proceedings

Petitioners' English Counsel has set forth the key timing considerations and potential remedies available in the United Kingdom, and their associated relevance to Petitioners' request.[54] The $LIBRA records sought in the Subpoenas are "for use" in "foreign proceedings." 28 U.S.C. § 1782(a). "Where an applicant has not yet initiated a foreign proceeding, [Section 1782] discovery is available when the materials may help the applicant either to plead or to prove the anticipated claims." *In re Mangouras*, 2017 WL 4990655, at *5 (S.D.N.Y. Oct. 30, 2017) (citing *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015)). "Indeed, 'the foreign proceeding need not be

---

[52] *See Hurlock v. Kelsier Ventures et al*, No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 1-2 (Ex. B – Affirmation of Service) (affidavit of service showing Chow'sNew York residential address).

[53] *Id.*

[54] *See* O'Rourke Decl. ¶¶ 34-39.

pending, so long as it is within reasonable contemplation.'" *Id.* (citation omitted); *see also Intel*, 542 U.S. at 259 (explaining that a foreign proceeding need not have commenced at the time when Section 1782 discovery is sought, it must only "be within reasonable contemplation.").

The contemplated Foreign Proceedings qualify as "foreign proceedings" for purposes of a Section 1782 discovery request. A petitioner need only "provide some objective indicium that the action is being contemplated." *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018). Here, Petitioners' English Counsel more than satisfies this standard, averring that he has been retained to pursue the Judgment enforcement against Argentina, that he is contemplating initiating enforcement proceedings within the United Kingdom, and that the requested discovery likely will be of use in the enforcement of the Judgment.[55] This is objective evidence that Petitioners' "foreign proceeding" is "within reasonable contemplation." *See In re Hornbeam Corp.*, 722 F. App'x 7, 9–10 (2d Cir. 2018) (a foreign proceeding was reasonably contemplated where the applicant "represented that it intended to initiate further litigation," and "articulated a theory on which it intended to litigate").[56]

Numerous courts have also affirmed that civil proceedings before English courts satisfy Section 1782's requirement that the proceedings be in a "foreign or international tribunal." *See, e.g.*, *In re Letter of Request from Crown Prosecution Serv. of U.K.*, 870 F.2d 686, 691 (D.C. Cir. 1989) ("[T]here is no question that British courts qualify as 'tribunals' [for Section 1782

---

[55] *See* O'Rourke Decl. ¶¶ 34-39.
[56] *See also Matter of Rosa Carolina Germano Dos Santos*, 2023 WL 4993673, at *5 (D.N.J. Aug. 4, 2023) ("[A] sworn statement evincing the intent to litigate and articulating the legal theories to be pursued is generally sufficient to demonstrate reasonable contemplation."); *Yilport Holding*, 2023 WL 2140111 at *4 ("A foreign proceeding need not be pending at the time a Section 1782 application is filed, provided it is 'within reasonable contemplation.'") (quoting *Intel*, 542 U.S. at 259).

purposes]."); *see also In re Ex Parte Application of Glob. Energy Horizons Corp.*, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015). Courts have consistently sanctioned the use of Section 1782 discovery in judgment-enforcement proceedings.[57]

Here, the Foreign Proceedings are also adjudicative in nature. Petitioners are actively contemplating enforcement proceedings in the United Kingdom.[58] Those proceedings would require the High Court to make substantive legal determinations beyond merely locating assets. However, before the High Court can adjudicate whether to grant any relief against the $LIBRA assets, it must first determine threshold questions.[59] Thus, because the discovery sought from Respondent Chow is essential to this preliminary adjudicative determination, the Foreign Proceedings plainly qualify as foreign proceedings under Section 1782.

Further, Petitioner's requested discovery is "for use" in the Foreign Proceedings. Petitioner plainly satisfies this requirement here. As explained above and in the O'Rourke Declaration, the information sought in the Subpoenas is highly material and relevant to the Foreign Proceedings.[60]

---

[57] *See Linsen Int'l Ltd. v. Humpuss Sea Transp. PTE LTD*, 2011 WL 1795813, at *1 (S.D.N.Y. Apr. 29, 2011) (granting Section 1782 application in aid of a foreign enforcement proceeding) (unreported); *see also In re Request for Subpoena by Ryanair Ltd.*, 2014 WL 5583852, at *1–2 (N.D. Cal. Oct. 31, 2014) (granting application for use in Dublin judgment-enforcement proceeding) (unreported); *see also In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007) (permitting discovery for use in a Panamanian post-judgment proceeding); *In re Application of Temp. Servs. Ins. Ltd.*, 2009 WL 2843258, at *1–2 (W.D.N.Y. Aug. 28, 2009) (granting application where the applicant sought discovery to locate assets of foreign judgment debtor for purposes of enforcing that judgment) (unreported); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 360–61 (S.D.N.Y. 2014) (granting application to obtain communications for use in a proceeding brought in the United Kingdom to enforce the applicant's default judgment).

[58] *See* O'Rourke Decl. ¶¶ 34-39.

[59] *Id*.

[60] *See* O'Rourke Decl. ¶¶ 34-39.

Petitioner will use the evidence sought here to aid the Petitioners in discovering Argentine assets within and outside of the United Kingdom.[61]

### 3. Petitioners Are Interested Persons

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings. While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *In re Application of financialright claims GmbH*, 2024 WL 4818177, at *7 (D. Del. Nov. 18, 2024). Petitioners are the beneficial owners of the GDP Warrants, and accordingly are the prototypical "interested person[s]" under *Intel*.

### B. All Discretionary *Intel* Factors Favor Permitting The Discovery Petitioners Seek

Once the threshold requirements under Section 1782 are met, the Court should consider the four discretionary "*Intel* factors." Each weighs in favor of granting the requested discovery.

*First*, Respondent will not be a party to the English Proceedings. *Second*, there is no reason to believe that English courts would be unreceptive to evidence obtained through Section 1782 discovery. *Third*, Petitioners are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence. *Fourth*, the Petitioners' requests are carefully circumscribed and targeted to key facts so as to avoid an undue burden on Respondent Chow.

---

[61] *See* O'Rourke Decl. ¶¶ 34-39.

### 1. The First *Intel* Factor Favors Granting Discovery

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. *See Intel*, 542 U.S. at 244, 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for [Section] 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."). Here, Respondent will not be a party to the Foreign Proceedings.[62] Nor does the Application seek evidence that is within the jurisdictional reach of the U.K. tribunal.[63] The first *Intel* factor therefore weighs in favor of discovery.

### 2. The Second *Intel* Factor Favors Granting Discovery

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through Section 1782. *See, e.g.*, *In re Application of OOO Promnesftstroy*, 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing the second *Intel* factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782") (emphasis added) (unreported). There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa*, 51 F.3d 1095, 1102 (2d Cir. 1995).

For the reasons set forth in U.K. counsel's declaration, the English courts will likely be receptive to evidence obtained through this Application.[64] *See In re Application of Shervin*

---

[62] *See* O'Rourke Decl. ¶ 38.
[63] *Id.*
[64] *See* O'Rourke Decl. ¶¶ 40-44.

*Pishevar*, 439 F. Supp. 3d 290, 303–04 (S.D.N.Y. 2020) (holding that the petitioner "has made a showing that the English courts would be receptive to evidence obtained" through the [Section] 1782 application). Furthermore, evidence of asset transfers associated with (or originated from), a judgment debtor are highly relevant in judgment enforcement proceedings. *See, e.g.*, *Linsen Int'l Ltd.*, 2011 WL 1795813, at *1 (granting an application to locate assets for use in English proceedings); *La Suisse*, 62 F. Supp. 3d at 360–61 (granting application to obtain communications for use English proceedings).

### 3. The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor looks to "whether the [Section] 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. The *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad. *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the *discoverability* of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement."); *see also Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Nor is there any requirement that Petitioner must exhaust his remedies in the foreign court first. *See In re Metallgesellschaft AG*, 121 F.3d at 79 ("[A] 'quasi-exhaustion requirement' finds no support in the plain language of the statute and runs counter to its express purposes.").

Here, there is no reason to believe that any of the discovery sought violates any foreign laws and/or public policy because it is limited and focused specifically on the information needed to identify the insiders that profited alongside Davis when $LIBRA launched and other records needed to locate Argentina's assets. Moreover, these requests do not offend UK law.[65]

### 4. The Fourth *Intel* Factor Favors Granting Discovery

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. "[A] district court evaluating a [Section] 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302; *see also In re Bayer AG*, 146 F.3d at 195 ("The reference in [Section] 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute.").

Courts have concluded that undue burden should be analyzed based "on the relevance of the information sought—and in the case of a [Section] 1782 petition, relevance is assessed with regard to the foreign proceeding." *See Catalyst Managerial Servs., DMCC v. Libya Africa Inv. Portfolio*, 680 F. App'x 37, 39 (2d Cir. 2017). Here, as explained above, the document requests are directly relevant to the issues in the foreign proceedings.[66] The document requests are also narrowly tailored and temporally limited—meaning that whatever burden Respondent may incur by producing the requested discovery is both modest and proportionate given the circumstances.

---

[65] *See* O'Rourke Decl. ¶¶ 40-44.
[66] *See* O'Rourke Decl. ¶¶ 34-39.

## V. CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order associated with Petitioners' application; (c) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas for information and for the requested depositions; and (d) grant any and all other relief to Petitioners as deemed just and proper.


Dated: August 4, 2025

      /s/ *Odysseas Repousis*
Odysseas Repousis (Bar No. 5536354)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 5th Avenue, 9th Fl.
New York, NY 10016
Tel. (212) 849-7000
odysseasrepousis@quinnemanuel.com

David M. Orta (*pro hac vice forthcoming*)
Daniel Salinas (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel. (202) 538-8000
davidorta@quinnemanuel.com
danielsalinas@quinnemanuel.com

*Counsel for Petitioners Palladian Partners, L.P., HBK Master Fund L.P., Hirsh Group LLC, and Virtual Emerald International Limited*