UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of:

PALLADIAN PARTNERS, L.P., HBK MASTER
FUND L.P., HIRSH GROUP LLC, and VIRTUAL
EMERALD INTERNATIONAL LIMITED,

                                    Petitioners,

FOR AN ORDER TO TAKE DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS PURSUANT
TO 28 U.S.C. § 1782.

Case No. 1:25-mc-00330 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

On August 4, 2025, Petitioners Palladian Partners, L.P., HBK Master Fund L.P., Hirsh
Group LLC, and Virtual Emerald International Limited (collectively, "Petitioners") filed an
application pursuant to 28 U.S.C. § 1782 for an order compelling discovery for use in a foreign
proceeding (the "Application"). Dkt. 1. Respondent Benjamin Chow ("Respondent"), the
subject of the proposed subpoena, opposes the application. Dkt. 20. The Court held oral
argument on the fully briefed application on September 23, 2025. For the reasons that follow,
the Court DENIES the Application.

<b>BACKGROUND</b>

**I.    The English Proceedings**

The instant application is related to a dispute between Petitioners and the Republic of
Argentina ("Argentina"), a nonparty to this Application, related to certain securities (the
"Securities") issued in connection with major debt restructuring following Argentina's sovereign
debt crisis in 2001. Dkt. 6 ("O'Rourke Decl.") ¶¶ 6, 8, 10. Petitioners are the beneficial owners
of the Securities and together hold approximately 46 percent of the total outstanding notional
amounts. O'Rourke Decl. ¶ 6. The Securities provided for additional contingent payments

based on the performance of Argentina's economy through the year 2034, provided that Argentina's real GDP met certain contractually specified benchmarks. O'Rourke Decl. ¶ 9.

On December 15, 2014, Argentina failed to make payment under the Securities for the year 2013, contending that one of the contractual payment conditions had not been met. O'Rourke Decl. ¶ 10. Petitioners Palladian, HBK, and Hirsh eventually commenced proceedings (the "English Proceedings") against Argentina and the Bank of New York Mellon as Trustee (the "Trustee") in the High Court of Justice, King's Bench Division, Commercial Court in London, England (the "English Trial Court"). O'Rourke Decl. ¶ 12. Petitioner Virtual Emerald International Limited became an additional claimant on December 11, 2019. O'Rourke Decl. ¶ 14. Petitioners' claim before the English Trial Court sought "declaratory relief, payment of the amounts due under the Securities, damages, interest, specific performance, injunctive relief and costs." O'Rourke Decl. ¶ 12.

The English Trial Court conducted a trial between October 24 and November 18, 2022, entered judgment in favor of the Petitioners on April 5, 2023, and issued an order giving effect to its judgment on June 9, 2023, following post-trial hearings. O'Rourke Decl. ¶ 15. The order required, among other things, Argentina to pay to the Trustee the payment amount under the Securities for the year 2013; prejudgment interest; Petitioners' Part 36 entitlements in the amount of €64,311,645.07; postjudgment interest on the 2013 payment amount and Petitioners' Part 36 entitlements; and Petitioners' costs (collectively, the "Judgment Sums" or the "Judgment"). O'Rourke Decl. ¶¶ 16-17. The order provides that each Petitioner has an individual right to enforce the Judgment Sums so long as each Petitioner retains holdings of the Securities, subject to certain conditions. O'Rourke Decl. ¶ 18. The execution of the provision requiring payment was stayed until Argentina exhausted its avenues of appeal, which occurred on October 14, 2024.

*See* O'Rourke Decl. ¶¶ 21-26.  The Judgment Sums thus became due and payable on November 28, 2024.  O'Rourke Decl. ¶ 26.

According to Petitioners' English counsel, judgments delivered by the English courts are enforceable as of right in England and Wales, and there is no need to commence separate enforcement proceedings.  Dkt. 24 ("Second O'Rourke Decl.") ¶ 10.  Petitioners have taken steps to enforce Argentina's obligations to pay the Judgment Sums since the Judgment Sums became due and payable, and all costs sums due to Petitioners have been satisfied by Argentina. O'Rourke Decl. ¶¶ 26-29.  On July 29, 2025, Petitioners filed motions in the courts of England and Wales seeking third party debt orders ("TPDO") under Civil Procedure Rule ("CPR") 72 related to accounts held by Argentina with eight banks.  Second O'Rourke Decl. ¶ 24. Petitioners also filed a petition in the U.S. District Court for the District of Columbia on June 23, 2025, seeking recognition and enforcement of the outstanding Judgment Sums.  O'Rourke Decl. ¶ 30; Complaint, *Palladian Partners, L.P. v. Republic of Argentina*, No. 25-cv-01954 (D.D.C. June 23, 2025), ECF No. 1; *see* O'Rourke Decl. ¶¶ 31-32 (listing outstanding sums).  Petitioners represent that they are "now in the process of identifying available assets held by [Argentina] in contemplation of further enforcement steps they should take in the English Proceedings, and/or otherwise in the Courts of England and Wales, to satisfy the approximately" €1,543,508,749.15 in outstanding Judgment Sums.  O'Rourke Decl. ¶ 33.  Petitioners have also detailed the steps they would take to recover on the Judgment in Commonwealth jurisdictions and member states of the European Union.  Second O'Rourke Decl. ¶ 10.

## II.    Meteora and the $LIBRA Token Launch

As part of their enforcement efforts, Petitioners are seeking information related to Argentina's potential ownership of assets generated by the 2025 launch of $LIBRA, a "memecoin" cryptocurrency token.  O'Rourke Decl. ¶¶ 33, 36; Dkt. 4 ("Br.") at 2-3.  According

to Petitioners, nonparty Hayden Davis, a cryptocurrency entrepreneur and the owner of Kelsier Ventures, began working with Argentina's President, Javier Milei, in or around July 2024 to launch the $LIBRA token. Br. at 7-8. Petitioners have submitted numerous news articles and other sources describing the $LIBRA scheme, which allegedly involved Davis, several of Davis's family members, President Milei, Karina Milei (President Milei's sister and a member of the Argentinian government), various cryptocurrency entrepreneurs, and Bartosz Lipinski, the lead engineer of the Solana network, among others. *See* Dkt. 25-18 at 2-3, 24; Dkt. 25-1 at 2-4.

On February 14, 2025, President Milei posted the following on his personal account on X.com: "Liberal Argentina is growing! This private project will be dedicated to incentivizing the growth of the Argentine economy, funding Argentine small businesses and entrepreneurial ventures. The world wants to invest in Argentina. LONG LIVE FREEDOM, DAMN IT!" Dkt. 25-5 at 2, 25. The post also included links to "www.vivalalibertadproject.com" and the $LIBRA token address on the Solana network. Dkt. 25-5 at 2-3; *see also* Br. at 8. The Viva La Libertad Project's stated mission was "to boost the Argentine economy by funding small projects and local businesses, supporting those who seek to grow their ventures and contribute to the country's development." Dkt. 25-5 at 3. $LIBRA initially received significant inflows, but lost 89 percent of its value within hours, purportedly causing investors approximately $251,000,000 in losses. Br. at 12. President Milei deleted his X post shortly after midnight on February 15, 2025, and later posted that he had no affiliation with the Viva La Libertad project. Dkt. 25-5 at 3.

Davis launched $LIBRA using Meteora, a "software that runs an automated digital asset trading platform for peer-to-peer swaps of digital assets on the Solana blockchain network." Decl. of Benjamin Chow ¶ 2, *Hurlock v. Kelsier Ventures*, No. 25-cv-03891 (JLR) (S.D.N.Y.

July 27, 2025), ECF No. 54 ("First Chow Decl.");[1] O'Rourke Decl. ¶ 7. Meteora is "decentralized" and "permissionless," meaning that "anyone can use it," since it uses self-executing "smart contracts," a form of "computer code that automatically execute[s] predefined actions when certain conditions are met." First Chow Decl. ¶ 2 n.1. Davis had previously launched other cryptocurrencies using the Meteora software, including $MELANIA and $M3M3. Br. at 8.

Respondent Chow is Meteora's Co-Founder and former CEO. O'Rourke Decl. ¶ 7. He "contributed to the development of the Meteora software" and "used to provide technical support to Meteora users" at the direction of Dynamic Labs Limited, "the software development company that created the computer code underlying Meteora." First Chow Decl. ¶ 1. On February 16, 2025, Respondent posted on X.com to explain Meteora and his involvement in $LIBRA and stated: "we had no involvement in the [$LIBRA] project at all beyond providing IT support, including commenting on the liquidity curve and helping verify the token's authenticity after the token was publicly launched." Ben Chow (@hellochow), X (Feb. 16, 2025), https://x.com/hellochow/status/1891341548-115149190 [https://perma.cc/DBL7-985Y].

## III.    Procedural History

Petitioners filed the present Application on August 4, 2025 *ex parte*, along with the declarations of Odysseas Repousis and Aidan Alexander O'Rourke. *See generally* Dkt. 1; Br.; Dkt. 5 ("Repousis Decl."); O'Rourke Decl. On August 12, 2025, the Court directed Petitioners to file a letter motion seeking leave to proceed *ex parte* if they believed there was a basis to do so, or to serve a copy of the Application on Respondent within five days of the Order in the

---

[1] Respondent's declaration submitted in this matter "adopte[d] and incorporate[d]" the declaration Respondent filed in *Hurlock v. Kelsier Ventures*, No. 25-cv-03891 (JLR) (S.D.N.Y.), "fully [t]herein." Dkt. 21 ("Second Chow Decl.") ¶ 2.

absence of such a motion.  Dkt. 8 at 1.  On August 15, 2025, Petitioners informed the Court that they did not seek to proceed *ex parte* on their Application, but that they had thus far been unable to effect personal service on Respondent.  Dkt. 10 at 1.

On August 18, 2025, Petitioners filed a further update with respect to service on Respondent.  Dkt. 12 at 1.  They informed the Court that Respondent had vacated his last known address in New York and that the process server had not been able to contact Respondent's family members.  *Id.*  Petitioners asked permission to serve Respondent's counsel via email and certified mail.  *Id.* at 2.  Before the Court could rule on the request, Respondent accepted service and requested an adjournment of the deadline to file an objection.  Dkt. 16 at 1-2.  In an Order dated August 27, 2025, the Court extended Respondent's deadline to oppose the Application to September 10, 2025.  Dkt. 17.[2]

The Application is now fully briefed, and the Court heard oral argument on the Application on September 23, 2025.  *See generally* Dkt. 20 ("Opp."); Dkt. 21 ("Second Chow Decl."); Dkt. 22; Dkt. 23 ("Reply"); Second O'Rourke Decl.; Dkt. 25 ("Orta Decl."); Dkt. 30-2 (September 23, 2025 Oral Argument Transcript) ("Tr.") .

## LEGAL STANDARD

28 U.S.C. § 1782(a) provides that a district court may order a person within a district to "give his testimony or statement or to produce a document or other thing for use in a proceeding

---

[2] The Court also initially ordered Petitioners to serve Argentina, a party in interest with respect to the present discovery application.  Dkt. 8.  The Petitioners asked to proceed with the adjudication of the Application prior to effecting service on Argentina given the likely delays in service under the Hague Convention, or to dispense with the requirement that Petitioners serve the Application on Argentina via the Hague Convention.  Dkt. 12 at 4.  The Court granted Petitioners' request to proceed with the Application prior to effecting service of process upon Argentina via the Hague Convention, Dkt. 17, because of the delays that result from Hague Convention service, but most of all because Argentina has actual notice of the Application, Dkt. 12 at 3-4.  Argentina has not moved to intervene in this matter.

in a foreign or international tribunal." Before granting a section 1782 application, the Court

must first determine whether the application satisfies section 1782's three statutory requirements:

> (1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.

*Federal Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 148 (2d Cir. 2022)

(alteration in original) (quoting *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015)). If the district

court determines the statutory requirements are met, it may grant the application "in its

discretion . . . 'in light of the twin aims of the statute: providing efficient means of assistance to

participants in international litigation in our federal courts and encouraging foreign countries by

example to provide similar means of assistance to our courts.'" *Id.* (omission in original)

(quoting *Mees*, 793 F.3d at 297-998). To determine whether to grant the application, courts

consider the four factors the Supreme Court identified in *Intel Corp. v. Advanced Micro Devices,

Inc.*, 542 U.S. 241, 264-65 (2004). *See Federal Republic of Nigeria*, 27 F.4th at 148.

## DISCUSSION

Petitioners seek an order authorizing them to obtain discovery for use in connection with

enforcement actions related to the English Proceedings. *See* Dkt. 5-1 (proposed subpoena).

Specifically, Petitioners seek a broad swath of documents and communications, including all

documents and communications concerning the creation, deployment, configuration, and

operation of the Meteora liquidity pool used for $LIBRA trading; all documents concerning

other memecoin launches on Meteora involving Davis or any Kelsier entity; all documents

concerning Meteora's "Dynamic Liquidity Market Maker" system and its use in token launches;

and all communications with more than 13 persons or entities, including Davis, President Milei,

"[a]ny cryptocurrency influencers engaged to promote $LIBRA," and Dave Portnoy, the social

media personality who founded Barstool Sports. *Id.* at 31-39. Petitioners also seek to depose Respondent regarding several topics, including the configuration of the liquidity pool used for $LIBRA, communications with Davis and other parties regarding $LIBRA, and other memecoin launches on Meteora involving Davis or "any Kelsier [Ventures] entity or similar patterns." *Id.* at 40-42. Respondent opposes the Application and argues that it should be denied because Petitioners have not satisfied the statutory requirements or the *Intel* factors. *See generally* Opp.

## I.    Statutory Requirements

The Court begins with section 1782's statutory requirements. Respondent does not dispute that he resides or can be found in this District or that Petitioners are interested parties. Tr. at 47:17-20. Instead, he focuses on the remaining statutory requirement and argues the Application must be denied because Petitioners have not shown that the discovery is "for use" in a foreign proceeding. Opp. at 10-13.

The "for use" requirement assesses "the practical ability of an applicant to place a beneficial document — or the information it contains — before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017). This requires the court to consider, among other things, "(1) whether a foreign proceeding is adjudicative in nature; and (2) whe[ther] there is actually a foreign proceeding." *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998). The Court begins by considering whether the contemplated enforcement proceedings are adjudicative in nature.

### A.    Adjudicative Proceeding

Petitioners have shown that the enforcement efforts related to the English Proceedings are "adjudicative" in nature. "[T]o satisfy the second statutory requirement, the applicant must seek discovery for use in an 'adjudicative' proceeding." *Federal Republic of Nigeria*, 27 F.4th at 148 (citing *In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017,

1020-22 (2d Cir. 1967)).  Whether a foreign proceeding is adjudicative "is determined on a case-by-case basis, with 'close attention [paid] to the foreign proceeding' to determine whether the discovery sought 'will be employed with some advantage or serve some use in the [foreign] proceeding.'"  *In re YS GM Marfin II LLC*, No. 20-mc-00182 (PGG), 2022 WL 624291, at *5 (S.D.N.Y. Mar. 2, 2022) (alterations in original) (quoting *Union Fenosa Gas, S.A. v. Depository Tr. Co.*, No. 20-mc-00188 (PAE), 2020 WL 2793055, at *4 (S.D.N.Y. May 29, 2020) (*Union Fenosa I*)); *accord In re Itaú Unibanco S/A*, No. 24-mc-00459 (KHP), 2025 WL 918462, at *6 (S.D.N.Y. Mar. 26, 2025).  "[W]hen a proceeding involves a judge deciding contested legal or factual issues, it is generally understood to be adjudicative."  *In re Ativos Especias II*, No. 24-mc-00119 (LJL), 2024 WL 4169550, at *6 (S.D.N.Y. Sept. 12, 2024).

    Citing the Second Circuit's decision in *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, Respondent argues that the contemplated English action is not adjudicative in nature because the "contemplated foreign proceeding is merely to enforce a judgment."  Opp. at 12.  Some courts in this Circuit have read *Euromepa* to preclude section 1782 discovery in connection with a postjudgment enforcement proceeding.  *See, e.g.*, *Jiangsu S.S. Co. v. Success Superior Ltd.*, No. 14-cv-09997 (CM), 2015 WL 3439220, at *6-7 (S.D.N.Y. Feb. 5, 2015).  However, those cases are not persuasive because they preceded the Second Circuit's 2022 decision in *Federal Republic of Nigeria*, which clarified *Euromepa*'s holding.  *See Federal Republic of Nigeria*, 27 F.4th at 157-58.  In *Federal Republic of Nigeria*, the Second Circuit explained that *Euromepa* was "fundamentally a case about mootness, at least in the practical sense," because in *Euromepa,* the French equivalent of the "*res judicata* doctrine prevented the French bankruptcy court from reconsidering the underlying merits of the dispute, and thus the discovery sought in the United States was no longer of any use in the matter for which it was originally sought."  *Id.* at 158.

9

Therefore, in *Federal Republic of Nigeria*, the Second Circuit permitted postjudgment discovery through a section 1782 application even though there was an already existing judgment, rejecting the notion that "mere completion of an initial adjudication of a dispute categorically disqualifies a foreign proceeding under § 1782's statutory 'proceeding' requirement." *Id.*

Thus, courts since *Federal Republic of Nigeria* have concluded that section 1782 discovery is available for postjudgment enforcement proceedings so long as the enforcement proceeding is adjudicative, that is, that it would "involve factfinding or adjudication by [a foreign] tribunal," *Union Fenosa I*, 2020 WL 2793055, at *5. *See, e.g.*, *In re YS GM Marfin*, 2022 WL 624291, at *5-7 (citing *Federal Republic of Nigeria* in rejecting argument that *Euromepa* foreclosed section 1782 discovery for any postjudgment enforcement proceedings and concluding postjudgment enforcement proceeding was adjudicative); *In re Uphealth Holdings, Inc.*, No. 24-mc-00377 (LGS), 2024 WL 4203228, at *2 (S.D.N.Y. Sept. 16, 2024) (rejecting argument that *Euromepa* "categorically exclude[d] post-judgment enforcement proceedings as non-adjudicative such that they do not qualify as 'foreign proceedings' under § 1782").

Several courts in this district have concluded that English postjudgment enforcement proceedings similar to those presented here are adjudicative in nature. In *Union Fenosa I*, for example, the petitioner sought discovery related to enforcement of a final judgment in an English court. 2020 WL 2793055, at *4. While the petitioner did not specify the precise enforcement remedy it would pursue, it did submit a declaration of local counsel describing remedies that petitioner might employ, including a TPDO and an *ex parte* proceeding. *Id.* at *4-5. The court concluded that both remedies had adjudicative aspects and that, though "relatively close," petitioner had met its burden of showing that the contemplated English proceeding was adjudicative in nature. *See id.* Another court adopted this reasoning in *In re Unión Fenosa Gas,*

*S.A.*, No. 20-mc-00171 (PKC), 2020 WL 3446871 (S.D.N.Y. June 23, 2020) (*Union Fenosa II*),

and found that the English postjudgment enforcement proceedings were adjudicative rather than

administrative because the expert opined that there would be an "adversarial proceeding that

includes judicial scrutiny of a TPDO application and a potential hearing." *Id.* at *4. Similarly,

the *In re YS GM Marfin* court concluded that the contemplated English action was adjudicative

in nature because the proceedings petitioners identified, a TPDO and an application under CPR

71 for an order requiring the judgment debtors to proceed with a hearing questioning them

"about the location of their assets," would "not be merely 'administrative,' as they [would]

involve a court hearing or judicial review of a TPDO application." 2022 WL 624291, at *6.

These decisions persuade the Court that the contemplated enforcement proceedings here

are also adjudicative. Petitioners identify several contemplated remedies here — including a

TPDO proceeding, an application under CPR 71, and a worldwide asset freeze — that their

English counsel attests (without contradiction) would "requir[e] the English Courts to consider

issues of fact and law and make judicial determinations," including "the ownership of relevant

property," immunities, and "whether there is a real risk of the judgment debtor dissipating assets

so as to justify the [English] Court freezing those assets." Second O'Rourke Decl. ¶ 17(A); *see*

*id.* ¶¶ 15, 19, 22; Tr. at 22:3-25. As in the *Union Fenosa* cases and *In re YS GM Marfin*, the

Court is persuaded that these proceedings would not merely be "administrative," and would

instead require the English Court to resolve contested legal or factual issues. Thus, Petitioners

have met their burden to show that the enforcement proceedings in connection with the English

Proceeding are adjudicative.

### B.    Reasonable Contemplation

"[T]o qualify as a 'foreign proceeding' within the meaning of the statute, the proceeding

in question need not be 'pending' or 'imminent'; rather, it is necessary only that 'a dispositive

ruling' be 'within reasonable contemplation.'"  *Mangouras v. Squire Patton Boggs*, 980 F.3d 88,

100 (2d Cir. 2020) (quoting *Intel*, 542 U.S. at 259).  Respondent argues that because the

Petitioners seek discovery to aid in the development and execution of their enforcement strategy,

any proceedings they may bring in the United Kingdom or elsewhere are merely speculative.

Opp. at 11.  Petitioners respond that they are not seeking discovery in aid of a hypothetical and

speculative proceeding because their English Judgment is final and enforceable as of right in

England and Wales, without the need for the filing of a separate proceeding, and Petitioners are

currently filing enforcement applications in the English Proceedings.  Reply at 2-3; Second

O'Rourke Decl. ¶ 10.  The Court agrees that Petitioners' enforcement efforts in the English

Proceeding are reasonably contemplated.

       While "courts in this District have rejected Section 1782 applications when the petitioner

sought discovery to determine *whether* to *initiate* a collection proceeding," *In re China Constr.*

*Bank (Asia) Corp.*, No. 23-mc-00017 (JMF), 2023 WL 3791711, at *2 (S.D.N.Y. June 2, 2023)

(second emphasis added), that is not case here because the English Proceeding is ongoing in the

enforcement stage, evidenced by the fact that Petitioners are currently filing enforcement

applications in the English Proceeding.  *Union Fenosa I* and *In re Habib*, No. 21-mc-00522

(KMK), 2022 WL 1173364 (S.D.N.Y. Apr. 20, 2022), are instructive.  In *Union Fenosa I*, for

example, the petitioner had registered an arbitral award in the United Kingdom, giving it the

force of an English court judgment, and intended to seek attachment of Egypt's assets within that

proceeding.  2020 WL 2793055, at *3, *5.  The court rejected the argument that the attachment

proceedings were merely speculative, explaining that the petitioner had met its burden of

establishing that the English proceeding was within reasonable contemplation in part because the

"proceeding in which [petitioner] intend[ed] to move to attach funds [was] ongoing," *id.* at *6,

even though there was a final arbitral award.  Similarly, in *Habib*, the petitioner sought discovery in connection with an ongoing enforcement proceeding pending in the United Arab Emirates Execution Court initiated after the petitioner was awarded a judgment in the United Arab Emirates Commercial Court.  *See* 2022 WL 1173364, at *1 & n.1.  The court concluded the discovery was "for use" in a foreign tribunal because the enforcement proceeding was "ongoing" and the petitioner would use the requested discovery to identify and seize assets belonging to the judgment debtor.  *Id.* at *2-3.

While Petitioners have not initiated a separate enforcement proceeding as in *Union Fenosa I* and *Habib*, English law does not require them to do so to enforce the judgment within England and Wales.  O'Rourke Decl. ¶ 10.  Petitioners have submitted information indicating that the underlying English Proceeding is ongoing, since the current enforcement steps that they have taken against third parties are part of the same underlying action and there is a judge actively presiding over these enforcement proceedings.  *See* Dkt. 6-1 at 2 (claim form in English Proceedings listing claim number as FL-2019-000010); Dkt. 24-5 (interim TPDO noting that the application was filed in connection with claim number FL-2019-000010); Dkt. 24-6 (same); Second O'Rourke Decl. ¶ 25 (noting a judge in the King's Bench Division entered interim orders in the TPDO applications on August 4, 2025); Tr. at 21:3-17.  Petitioners argue that information about the $LIBRA scheme will help them identify cryptocurrency wallets so they can take additional steps to enforce the Judgment before the English Court.  Second O'Rourke Decl. ¶¶ 33, 38-39.  Thus, as in *Union Fenosa I* and *Habib*, the Court concludes that the foreign proceeding is not hypothetical or speculative because Petitioners would be able to present any relevant information gleaned from the requested discovery to file motions or otherwise take enforcement steps in the English Proceeding, and has already taken other enforcement steps in

that proceeding. *See Union Fenosa I*, 2020 WL 2793055, at *5-6, *9 (granting application for discovery to trace ownership and possessory interests in funds so that petitioners could initiate additional enforcement steps in ongoing proceeding); *Habib*, 2022 WL 1173364, at *2-4 (similar).

In contrast, in cases where courts rejected discovery to identify assets in connection with postjudgment proceedings, the applicants did not have an enforceable judgment (unlike here) or a pending prejudgment attachment proceeding, or had not identified the countries or tribunals where they intended to file enforcement proceedings. *See In re MT BALTIC SOUL*, No. 15-mc-00319 (LTS), 2015 WL 5824505, at *2 (S.D.N.Y. Oct. 6, 2015) (foreign proceeding not within reasonable contemplation where petitioners did not "identify with particularity the types of proceedings they expect to bring . . . , nor the countries or tribunals in which they may take action"); *Jiangsu*, 2015 WL 3439220, at *1, *6-7 (similar, where petitioner requested discovery in aid of the enforcement of an arbitration award, but had not yet initiated arbitration); *In re Libyan Asset Recovery & Mgmt. Off.*, No. 21-mc-00852 (JGK) (BCM), 2023 WL 8445811, at *12 (S.D.N.Y. Nov. 16, 2023) (similar, where petitioner sought discovery as part of "wide-ranging investigation into whether, where, and against whom it may be able to bring future litigation to recover . . . assets," since the "potential foreign proceedings . . . [were] not yet even at the 'embryonic' stage" (citation omitted)); *In re Ativos Especiais II*, 2024 WL 4169550, at *8-9 (attachment proceeding was not within reasonable contemplation where petitioners did not yet have a judgment for damages, the underlying merits proceeding was still pending, and a prejudgment attachment proceeding was not pending or within reasonable contemplation).[3]

---

[3] Petitioners also state that they also "intend to pursue enforcement of the Judgment . . . elsewhere," Br. at 7; *see also id.* at 1 (referring to actions "possibly" and "potentially" elsewhere), possibly in Commonwealth jurisdictions or European Union member states, Second

Thus, Petitioners have satisfied their burden to show that the discovery is for use in an ongoing or reasonably contemplated foreign proceeding.

### C.    Recognition Proceeding in District of Columbia

Finally, that Petitioners have already filed an action for recognition and enforcement of the Judgment in the U.S. District Court for the District of Columbia does not mean they cannot avail themselves of section 1782 discovery here, the district where the Respondent resides or is found.  As Petitioners point out, nothing in either section 1782 or the Federal Rules of Civil Procedure prevents Petitioners from seeking enforcement in multiple jurisdictions while pursuing section 1782 discovery.  *See* Reply at 4.  The only case Respondent cites in support of this proposition, *Lufthansa Technik AG v. Astronics Corp.*, No. 11-cv-00628, 2011 WL 3957509 (W.D.N.Y. Sept. 7, 2011), involved the dismissal of a section 1782 application because it was duplicative of another section 1782 application that had already been filed in another district court.  *Id.* at *3.  Here, by contrast, there is no suggestion that Petitioners have filed a duplicative section 1782 application or that the present discovery application takes the place of the action for recognition and enforcement of the Judgment.  Thus, the separate and distinct action in the District of Columbia does not impact the statutory factors.

---

O'Rourke Decl. ¶ 10(A)-(B).  Petitioners have made no representation that enforcement proceedings in these yet-to-be-determined nations are pending, nor that they have taken any steps to initiate them; as such, Petitioners' hazy intent to "potentially" enforce the Judgment "elsewhere" does not satisfy the "for use" requirement because these actions are "merely speculative."  *See Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 124 (2d Cir. 2015); *Habib*, 2022 WL 1173364, at *3 n.4 (petitioner's statement that it was "contemplating pursuing litigation against individual(s) who may have aided and abetted Mr. Habib in his wrongdoing" did not satisfy the "for use" requirement because proceedings were speculative).

**D.  Conclusion as to Statutory Factors**

For all of these reasons, Petitioners have satisfied their burden to show that the discovery is for use in an ongoing or reasonably contemplated adjudicative foreign proceeding.  However, the lack of relevance of much of the information sought calls into question whether the Petition meets the statutory requirement that the information be "for use" in a foreign proceeding.  The Second Circuit has recently emphasized that "[t]he 'for use' statutory prerequisite assesses the *practical ability* of an applicant to place a beneficial document — or the information it contains — before a foreign tribunal."  *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024) (internal quotation marks omitted).  To satisfy that requirement, "the requested discovery must be employed with some advantage or serve some use in the proceeding."  *Id.* (internal quotation marks omitted).  As a result, "'an applicant who fails to demonstrate that the evidence is minimally relevant to the foreign proceeding' cannot obtain discovery pursuant to the statute." *In re Republic of Türkiye*, No. 24-mc-00557 (JPC), 2025 WL 2200159, at *10 (S.D.N.Y. Aug. 1, 2025) (quoting *BonSens*, 95 F.4th at 80).  As the Court will discuss further in connection with the fourth *Intel* factor, the wide-ranging discovery sought from Respondent is not relevant to the foreign enforcement proceedings but is instead a broad fishing expedition.  *See infra* pp. 21-33. Thus, for the reasons set forth below, even if the statutory factors are met, the Court will exercise its discretion to deny the petition.

**II.    *Intel* Factors**

Section 1782(a) "authorizes, but does not require, a federal district court to provide judicial assistance to foreign or international tribunals or to 'interested person[s]' in proceedings abroad."  *Intel*, 542 U.S. at 247 (alteration in original).  In exercising this discretion and considering whether the discovery would further the twin aims of section 1782, the Court evaluates the discretionary *Intel* factors:

(1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome."

*Mees*, 793 F.3d at 298 (quoting *Intel*, 542 U.S. at 264-65); *accord In re BonSens.org*, 95 F.4th at 79-80.  The *Intel* factors weigh against granting the Application.

## A.    The First Two *Intel* Factors

The first factor weighs in favor of granting the Application.  If the "person from whom discovery is sought is a participant in the foreign proceeding, . . . the need for § 1782(a) aid generally is not as apparent," but if the person from whom discovery is sought is a "nonparticipant[] in the foreign proceeding," they "may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Intel*, 542 U.S. at 264.  According to Petitioners, this factor weighs in favor of the Application because Respondent is not a participant in the foreign proceeding, is not expected to become one, and is not otherwise subject to the English Court's jurisdiction.  O'Rourke Decl. ¶¶ 37-38.  Respondent does not contest this factor, Tr. at 61:18-62:4, and the Court concludes it weighs in favor of granting the Application.

The second *Intel* factor supports granting the Application.  That factor asks the Court to assess the "receptivity" of the foreign court to "U.S. federal-court judicial assistance" as well as the nature of the foreign tribunal and the character of the foreign proceedings.  *Intel*, 542 U.S. at 264.  "A court should deny discovery on the basis of lack of receptiveness only where it is provided with 'authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782.'"  *In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166,

176-77 (S.D.N.Y. 2020) (alteration in original) (quoting *Euromepa*, 51 F.3d at 1100). "In the Second Circuit, this factor requires 'authoritative proof that a forum tribunal would reject evidence obtained with the aid of § 1782 . . . as embodied in a forum country's judicial, executive, or legislative declarations . . . .'" *Habib*, 2022 WL 1173364, at *3 (alteration adopted) (omissions in original) (quoting *In re Polygon Glob. Partners LLP*, No. 21-mc-00364 (ER), 2021 WL 2117397, at *8 (S.D.N.Y. May 25, 2021)). Petitioners represent that English courts are generally receptive to information obtained through section 1782 applications, O'Rourke Decl. ¶ 42, and Respondent has not introduced any information suggesting that the English courts would reject evidence obtained through a section 1782 application. Indeed, other federal courts have granted section 1782 applications for use in English courts. *See, e.g.*, *In re YS GM Marfin*, 2022 WL 624291, at *9 (second *Intel* factor weighed in favor of granting the application where "[r]espondents ha[d] not provided any basis for th[e] [c]ourt to conclude that English courts would not be receptive"); *In re Refinería de Cartagena S.A.S.*, No. 23-mc-00455 (JPC), 2024 WL 95056, at *10 (S.D.N.Y. Jan. 8, 2024) (similar). This weighs in favor of granting the application.

### B.    The Third *Intel* Factor

The third *Intel* factor, whether the application "conceals an attempt[] to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," *Intel*, 542 U.S. at 265, weighs against granting the application.

The parties dispute whether Petitioners are attempting to circumvent English law by requesting a deposition of Respondent. Petitioners' attempt to depose Respondent is not, on its own, an attempt to circumvent foreign proof-gathering restrictions. While English courts generally do not provide for depositions, O'Rourke Decl. ¶ 42, the Second Circuit has explained that the fact that "a country does not enable broad discovery within a litigation does not mean

that it has a policy that restricts parties from obtaining evidence through other lawful means,"
*Mees*, 793 F.3d at 303 n.20; *see also In re BNP Paribas Jersey Tr. Corp.*, No. 18-mc-00047
(PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018) ("Courts may grant § 1782
applications even where the applicant did not first seek discovery in the foreign tribunal, or
where the information sought was not discoverable under the laws of the foreign country at issue
in the foreign proceeding." (citation omitted)); *In re Accent Delight Int'l Ltd.*, 791 F. App'x 247,
251 (2d Cir. Nov. 13, 2019) (summary order) (distinguishing between section 1782 requests that
"seek[] documents that cannot be obtained because the foreign jurisdiction *prohibits* the
discovery of those documents," in which case the application seeks to circumvent a foreign
proof-gathering restriction, and those that "seek[] documents that cannot be obtained in a foreign
proceeding because the foreign jurisdiction does not provide a *mechanism* for such discovery").
"'[P]roof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the
acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of
claims by empowering parties to require their adversarial and non-party witnesses to provide
information." *Mees*, 793 F.3d at 303 n.20 (alteration in original) (quoting *Intel*, 542 U.S. at 265).
Petitioners aver that while English law does not make a mechanism for taking depositions
"available," O'Rourke Decl. ¶ 42, English courts are receptive to information obtained via
section 1782 proceedings, *id.* ¶ 43, and that English courts have permitted "litigants to conduct
depositions under § 1782 for the purposes of gathering evidence for use in English proceedings,"
Second O'Rourke Decl. ¶ 46.  Most importantly, Petitioners note that depositions have already
been introduced into evidence in the trial phase of the English Proceedings (albeit not collected
through section 1782 discovery), *id.* ¶ 47, indicating that Petitioners' attempt to depose
Respondent is not an effort to circumvent English proof-gathering restrictions.  *See Mees*, 793

F.3d at 303 n.20 ("Courts may also consider whether the nature, attitude and procedures of [a foreign] jurisdiction indicate that it is receptive to assistance under § 1782, even if it does not provide for similar discovery itself." (internal quotation marks and citation omitted)).[4]

However, courts evaluating the third *Intel* factor also consider "whether a petitioner is pursuing discovery in bad faith." *In re Order to Take Discovery*, No. 25-mc-00096 (JLR), 2025 WL 1446876, at *6 (S.D.N.Y. May 20, 2025) (quoting *In re Batbold*, No. 21-mc-00218 (RA) (OTW), 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021), *aff'd*, 2023 WL 2088524 (S.D.N.Y. Feb. 17, 2023)).  The sheer breadth of the information requested, well beyond that which would be relevant to the ownership of Argentinian assets, from a custodian who would not be the central source of relevant information, as set forth in the Court's discussion of the fourth *Intel* factor, suggests that Petitioners are on a fishing expedition and that the application is "misusing the § 1782 device." *Aguila Energia e Participações Ltda. v. JPMorgan Chase & Co.*, No. 22-mc-00228 (JGK) (SLC), 2024 WL 3650347, at *11 (S.D.N.Y. Feb. 29, 2024) (finding that third *Intel* factor weighed against petitioner because request for discovery did not demonstrate that respondent had "a connection to the transaction or ha[d] possession, custody, or control over documents responsive to the [s]ubpoena suggest[ing] that [petitioner] [was] on a fishing expedition"), *report and recommendation adopted*, 2024 WL 3373416 (S.D.N.Y. July 10, 2024), *aff'd*, No. 24-2133, 2025 WL 1661987 (2d Cir. June 12, 2025) (summary order).

---

[4] *In re WildBrain Family International Ltd.*, No. 19-cv-00527 (JPO), 2020 WL 6135765 (S.D.N.Y. Oct. 19, 2020), cited by Respondent, is distinguishable.  In that case, the order governing discovery provided for witness statements but not depositions. *Id.* at *2.  Thus, the court concluded that "ordering live testimony would be in tension with the proof-gathering procedures that govern the UK tribunal overseeing th[e] dispute." *Id.*  Here, by contrast, the English Court has accepted deposition testimony in the English Proceedings, indicating there is no such tension here.

Moreover, Petitioners refer to seeking this discovery not only in connection with the English Proceeding, but also to determine whether to initiate enforcement proceedings "elsewhere." Br. at 1, 7. As discussed, these proceedings do not satisfy section 1782's "for use" requirement because they are entirely speculative. *See supra* p. 15 n.3. *In re Harbour Victoria Investment Holdings Ltd.*, No. 15-mc-00127 (AJN), 2015 WL 4040420 (S.D.N.Y. June 29, 2015), is instructive. In that case, the petitioner indicated that it suspected respondents might "have bank accounts in Singapore or the United Kingdom" that could be used to satisfy an arbitral award. *Id.* at *8. The petitioner would "commence confirmation proceedings in those countries to enforce the arbitral award" "[i]f the discovery . . . confirm[ed] the existence of these bank accounts," but would "not commence such proceedings" "[i]f the discovery [did] not confirm the[ir] existence." *Id.* The court concluded that the petitioner was engaging in a fishing expedition to identify other foreign venues in which to enforce the arbitral award, noting that section 1782 "is not designed to provide potential litigants with information that will help them decide whether and where to commence proceedings." *Id.* (quoting *Jiangsu*, 2015 WL 3439220, at *6). Here too, Petitioners seek this discovery in connection with commencing enforcement proceedings "elsewhere" if discovery confirms the existence of proceeds from $LIBRA in Argentina's possession in Commonwealth or European Union jurisdictions. *See* Br. at 7 (stating that Petitioners may pursue "enforcement of the Judgment . . . elsewhere"); Second O'Rourke Decl. ¶ 10(A)-(B) (discussing feasibility of initiating enforcement proceedings in Commonwealth nations and the European Union). As in *Victoria Harbour Investment Holdings*, such general exploratory efforts reflect a misuse of the Application as a fishing expedition.

Thus, the third *Intel* factor weighs against Petitioners.[5]

## C.    The Fourth *Intel* Factor

The fourth *Intel* factor — whether the discovery sought is "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265 — weighs strongly against granting the application in light of the breadth of discovery sought and the custodian from whom it is sought.  In considering the fourth *Intel* factor, courts "assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."  *Mees*, 793 F.3d at 302.  "As applied to § 1782 applications, Rule 26 'contemplates that discovery requests be tailored to seek information relevant to the parties' claims and defenses and proportional to the needs of the case.'"  *Aguila*, 2024 WL 3650347, at *11 (quoting *Associacão dos Profissionais dos Correios v. Bank of N.Y. Mellon Corp.*, No. 22-mc-00132 (RA) (KHP), 2022 WL 4955312, at *8 (S.D.N.Y. Oct. 4, 2022), *report and recommendation adopted as modified in other part*, 2024 WL 4299019 (S.D.N.Y. Sept. 25, 2024)).  Rule 26(c) also provides that a "court *must* limit the frequency or extent of discovery otherwise allowed . . . if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  *Banoka S.à.r.l. v. Elliott Mgmt. Corp.*, 148 F.4th 54, 68-69 (2d Cir. 2025) (omissions in original)

---

[5] Petitioners' reliance *In re Accent Delight International Ltd.* to support their assertion that they "are well within their rights to rely on the 1782 discovery — whether within the High Court **or elsewhere**," Reply at 4, is misplaced.  In *Accent Delight*, the Second Circuit held that "Section 1782 does not prevent an applicant who lawfully has obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise," 869 F.3d at 135, and thus the district court's protective order appropriately permitted the petitioners to use the discovery in other proceedings, *see id.* at 133-35.  But in *Accent Delight*, unlike here, petitioners contemplated using the discovery in *ongoing* proceedings in France and Singapore, *id.* at 125, not in unidentified, uninitiated proceedings "elsewhere," as Petitioners here have stated.  Thus, *Accent Delight* does not persuade the Court that the Application is not a fishing expedition.

(quoting *Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 60 (2d Cir. 2024)); *accord* Fed. R. Civ. P. 26(b)(2)(C)(i).

Petitioners seek a broad range of documents related to the $LIBRA token launch on the theory that Chow has knowledge about the "location and control of assets belonging to Argentina." Br. at 15; *see also id.* at 24 (claiming that the "document requests are directly relevant to the issues in the foreign proceedings"). Respondent argues that Petitioners have not established that the broad discovery sought from Respondent would be relevant to the English Proceedings, and contends that Rule 26(b) requires denying the Application. *See* Opp. at 15-16. The Court agrees that the fourth *Intel* factor weighs heavily against the Application.

Petitioners' belief that Argentina owns or is the beneficial owner of $LIBRA assets is grounded primarily on (1) Davis's statements purportedly suggesting that the $LIBRA proceeds belong to Argentina, Br. at 2-3 & n.3; (2) a letter of intent that Argentina and Cube, a decentralized finance exchange originally intended to act as the marketplace for $LIBRA token sales, supposedly signed in late 2024, Reply at 8 n.15, 9; and (3) statements by the prosecutor in Argentina's criminal investigation of Milei and his sister suggesting that the state might have a future claim on $LIBRA funds if they were associated with criminal activity by public officials, *id.* at 10. The Court has some reservations about whether this evidence supports Petitioners' contention that the Argentinian Republic, rather than President Milei or his sister, or even Davis (insofar as he is holding $LIBRA assets with the eventual aim that they be invested into the Argentinian economy, *see* Tr. 55:14-56:2) owns the proceeds from the $LIBRA scheme. Not only are Davis's comments about the ownership of the $LIBRA assets less than clear, a report by Argentina's Anti-Corruption Office investigated possible violations of Argentina ethics law related to Milei's X post and concluded that Milei's "dissemination of the 'Viva la Libertad

Project' and its associated crypto-asset '$LIBRA' must be regarded as a personal (non-official) activity" of Milei's, Dkt. 25-5 at 25.  As for the letter of intent, Cube was not ultimately used for the launch of the $LIBRA token.  Tr. at 8:15-9:3; Reply at 8 n.15.  Finally, that there might be an eventual criminal proceeding that entitles the Argentine government to funds from $LIBRA in the future because they are proceeds of criminal activity does not suggest that Argentina currently owns the assets.

But even assuming there is a connection between Argentina's government and $LIBRA proceeds, the Court still concludes that the fourth *Intel* factor disfavors the Application because the proposed subpoenas sweep well beyond information that would be relevant to establishing Argentina's ownership of assets derived from $LIBRA tokens, and thus are not proportional to the needs of the English Proceedings.  Not only do the document subpoenas all begin with "All Documents," "All . . . Communications," or even "All banking and financial records," Dkt. 5-1 at 31-39, "which often is a red flag for overbreadth and undue burden," *In re Navios S. Am. Logistics Inc.*, No. 24-mc-00575 (LJL), 2025 WL 369717, at *11 (S.D.N.Y. Feb. 3, 2025) (citation omitted), most have nothing to do with assets purportedly owned by Argentina.

For example, Petitioners seek "[a]ll documents sufficient to identify *every* wallet address that interacted with the $LIBRA liquidity pool on Meteora," Dkt. 5-1 at 31 (emphasis added), without any limitation targeting those related to Argentina such as Milei, his sister, or the country of Argentina.  Petitioners also argue that the extensive information sought about the Meteora DLMM pool is "[e]ssential" to understanding how Meteora "enabled the alleged $LIBRA fraud" and "facilitated extraction of proceeds," O'Rourke Decl. app. A at 16, but general information about an open-source platform would not be relevant to tracing specific funds to Argentina.  Petitioners' broad request for "[a]ll documents concerning [Respondent's]

24

resignation from Meteora," including transition plans, severance agreements, and resignation letters, Dkt. 5-1 at 33-34, do not relate to Argentinian ownership of assets.  Similarly, Petitioners seek "[a]ll [d]ocuments concerning *other* memecoin launches on Meteora's platform involving [Davis] . . . or any Kelsier identity," including $MELANIA.  *Id.* at 34 (emphasis added).  There is no suggestion that Argentina has or had any ownership interest in any of the other memecoins and thus this information is not relevant to Petitioners' endeavor to trace Argentina's assets. Petitioner's contention that discovery about memecoin launches other than $LIBRA could establish a "pattern of conduct showing [a] sophisticated scheme beyond [a] single incident, supporting claims of ongoing conspiracy potentially benefiting Argentine interests through multiple extraction events," O'Rourke Decl. app. A at 18, is purely speculative.  Nor do Petitioners explain how obtaining Respondent's purported communications with *any* "cryptocurrency influencers engaged to promote $LIBRA," Dkt. 5-1 at 32  — including, for example, Dave Portnoy and other cryptocurrency influencers — would help them identify assets subject to Argentina's control, *see* O'Rourke Decl. app. A at 17.  Indeed, Petitioners do not even request documents reflecting Argentina's ownership in the $LIBRA token in the Application, and instead request virtually any document that touches upon the Meteora platform or $LIBRA. These requests are unduly broad and suggest Petitioners are engaged in a fishing expedition.  *See Banoka*, 148 F.4th at 69 (affirming district court's conclusion that document requests "encompass[ing] virtually any documents possessed by the [respondents] that *might* be related to the [transaction] were "expansive" and "unduly broad"); *In re Sailed Tech. (Beijing) Co.*, No. 22-cv-01396, 2022 WL 17324321, at *4-5 (W.D. Wash. Nov. 29, 2022) (fourth factor disfavored section 1782 application where the applicant failed to explain why it needed sweeping

information about "all Chinese manufacturers Amazon uses for nine products over a four-year period" and "manufacturing data and copies of all contracts" for its claims in foreign tribunal).

The proposed deposition topics also cover matters far afield from identifying Argentinian assets.  The proposed deposition subpoena includes matters such as Respondent's "role, responsibilities, and authority as co-founder . . . of Meteora during the relevant period," "[t]he configuration and operation of the DLMM liquidity pool used for $LIBRA," Respondent's "resignation as CEO of Meteora and its relationship to the $LIBRA incident," and "[o]ther memecoin launches on Meteora involving" Davis "or any Kelsier entity."  Dkt. 5-1 at 40-41. These broad topics suffer from the same infirmities as the document requests because they concern matters with little relevance to locating $LIBRA assets in Argentina's possession.  None of the topics even mentions Milei, Argentinian government officials, or even the country of Argentina.  Given the breadth of the deposition topics and their glancing relevance to identifying $LIBRA assets in Argentina's possession, the deposition subpoena is overbroad.

The Court acknowledges the Second Circuit's instruction that "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright.'"  *Mees*, 793 F.3d at 302 (quoting *Euromepa*, 51 F.3d at 1101).  But many of Petitioners' discovery requests — like all documents concerning *all* memecoin launches involving Davis on the Meteora platform other than $LIBRA, Dkt. 5-1 at 34, all banking and financial records showing fiat currency movement related to $LIBRA *or* Meteora operations, *id.* at 35, and all documents and communications concerning media coverage or public relations related to $LIBRA, including crisis management strategies and social media posts, *id.* at 37 — are so overbroad and divorced from Argentinian asset ownership that they could not be tailored

to more relevant requests.  Indeed, only one discovery request even mentions Argentina or Argentinian government officials.  *Id.* at 32 (requesting "[a]ll [d]ocuments and [c]ommunications with or concerning . . . President Javier Milei, Karina Milei, or any Argentine government officials").  The broad document requests and deposition topics would not have to be "tailored" — they would have to be entirely refashioned.  *Mees* does not require district courts to do this work for petitioners, and the Court declines to do so here.  *See In re Klein*, No. 23-mc-00211, 2023 WL 8827847, at *14 (S.D.N.Y. Dec. 21, 2023) (denying section 1782 application for overbroad subpoenas because "the record . . . [did] not permit the subpoenas to be . . . reformed" to focus on "record requests that were appropriate"), *aff'd sub nom. Klein v. Altara RK Invs. Ltd.*, No. 24-228, 2025 WL 560105 (2d Cir. Feb. 20, 2025) (summary order); *Mees*, 793 F.3d at 302 n.18 (noting that "if a § 1782 application 'is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application *in toto*, just as it can if discovery was sought in bad faith in domestic litigation'" (quoting *Euromepa*, 51 F.3d at 1101 n.6)); *cf. Morelli v. Alters*, No. 19-cv-10707 (GHW), 2020 WL 6508858, at *6 (S.D.N.Y. Nov. 5, 2020) (quashing, rather than tailoring, "substantially overbroad" requests for "information of tangential relationship to [p]laintiff's claims," including production of "any and all communications, documents, correspondence and the like evidencing any outstanding loans," which appeared to be a "fishing expedition").

Further, insofar as Petitioners are purporting to seek information about Argentina's ownership over $LIBRA tokens, as it claims its requests are intended to do, this information could be "obtained from some other source that is more convenient, less burdensome, or less expensive," *Banoka*, 148 F.4th at 68-69 (citation omitted), namely, from Argentina and Davis. Opp. at 16-18; Tr. at 40:4-15.  Petitioners acknowledge that they could seek information about

the provenance of the $LIBRA funds and whether Argentina has a right to the funds from Argentina itself, which is a party to the English Proceedings and is presently conducting a criminal investigation into this very issue.  Tr. at 18:7-19; Second O'Rourke Decl. ¶ 19 (describing Petitioners' ability to make an application under CPR 71 to compel Argentina or its officers "to give information and documents for the purposes of facilitating enforcement of a judgment," including "information and documents regarding the judgment debtor's foreign and domestic asset position").  More importantly, Petitioners focus on Davis as the central figure in the $LIBRA offering and on his comments regarding Argentinian involvement in the $LIBRA assets.  *See, e.g.*, Tr. at 7:19-8:4, 11:12-12:2.  Petitioners have filed a section 1782 application against Davis and other family members linked to the $LIBRA scheme in federal district court in Texas and therefore any information that Davis has about Argentina's involvement in the $LIBRA token and any purported Argentinian ownership of the $LIBRA tokens that he is holding, or otherwise, could be obtained directly from him.  *Id.* at 16:15-21.  Given that Petitioners are working to obtain information about whether the government of Argentina owns or would have a right to the $LIBRA proceeds from Davis (and could seek the information from Argentina itself in the English Proceeding), the sought-after information here "can be obtained from some other source that is more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C)(i).  *See Frasers*, 95 F.4th at 60 (district court's consideration of "the possibility that the applicant could obtain the discovery in the foreign proceedings along with other factors, including that pursuing discovery in the foreign court would have been more convenient," comported both with Rule 26 and section 1782).

Respondent also attests that he does not have knowledge or documents regarding Argentina's ownership of the $LIBRA tokens.  For Petitioners "to establish entitlement to a grant

of discovery under § 1782, it must establish that [Respondent] has possession, custody, or control of the requested documents." *Aguila*, 2024 WL 3650347, at *7; *see* Fed. R. Civ. P. 26(a)(1)(A)(ii); *In re Liverpool Ltd. P'ship*, No. 21-mc-00392 (AJN), 2021 WL 5605044, at *2 (S.D.N.Y. Nov. 24, 2021) (explaining that the petitioner "bears the burden of establishing [respondent's] control"). "'[U]nder ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in [its] possession, custody, or control' is sufficient to overcome a request for production . . . ." *In re CBRE Glob. Invs. (NL) B.V.*, No. 20-mc-00315 (VEC), 2021 WL 2894721, at *4 (S.D.N.Y. July 9, 2021) (second alteration in original) (quoting *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y. 1978)). Respondent has provided an uncontroverted declaration stating that he did not have "substantive involvement with the $LIBRA memecoin" and has "never met, spoken or corresponded with Argentinian President Javier Milei," nor does he have "any information in [his] possession, custody, or control connecting the Republic of Argentina to any assets relating to $LIBRA," Second Chow Decl. ¶¶ 2-3, as well as his sworn declaration filed in another case before this Court, in which he avers that he was "not a member of the Viva La Libertad! Project," "did not recruit President Javier Milei, Dave Portnoy, or any other alleged 'touters' to promote $LIBRA," and "did not set up the Meteora liquidity pool used . . . to sell $LIBRA tokens," First Chow Decl. ¶¶ 8, 10, 11. Many of the document requests also relate broadly to the configuration of the $LIBRA token. *See* Dkt. 5-1 at 31 (requesting "[p]ool configuration parameters and initialization settings" and "[d]ocuments sufficient to identify every wallet address that interacted with the $LIBRA liquidity pool"). However, the Meteora software that Respondent designed and that Davis used to configure the $LIBRA token was permissionless, meaning that anyone could use Meteora to set up a liquidity pool, customize its features, and launch the token, without

requiring "permission or approval" from any intermediary.  First Chow Decl. ¶ 2; *id.* ¶¶ 1, 2 n.1.

Respondent states that he "did not set up the Meteora liquidity pool used by Davis to sell

$LIBRA tokens," *id.* ¶ 11, "did not design or create $LIBRA tokens," *id.* ¶ 8, and "did not own,

control, or set up the virtual smart contract used to mint $LIBA tokens," *id.* ¶ 9.  Petitioners

never explain how such information would have been in Respondent's "possession, custody, or

control" while he was Meteora CEO, and do not explain how he could still access it given that he

undisputedly resigned from Meteora months ago.

 While Petitioners contend they have "ample reason not to credit Chow's declarations,"

Reply at 1, the evidence they identify linking Respondent Chow to specific $LIBRA information

is tenuous at best.  Petitioners have submitted more than 400 pages of evidence about the

$LIBRA launch, more than 350 pages of which discusses Davis, President Milei, and the events

leading up to the $LIBRA launch — without ever mentioning Respondent.  *See* Dkt. 25-1, Dkts.

25-3 to 25-19.  The exhibits that *do* involve Respondent suggest that he had little contact with or

knowledge of the operations of the $LIBRA launch.  *See* Dkt. 25-20 (copy of Respondent's

personal website listing Respondent as "[c]ofounder of Meteora"); Dkt. 25-21 (copy of hearing

transcript in *Hurlock*); Chow (@hellowchow), *supra*; *see also* Molly White, *Transcript of*

*Leaked Call With Meteora's Ben Chow* (Feb. 18, 2025),

https://www.citationneeded.news/meteora-ben-chow-call-transcript/ [https://perma.cc/TYJ6-

U2PT].  Respondent attests that he "used to provide technical support to Meteora users at

[Dynamic Labs Limited]'s direction until [his] resignation from the project several months ago,"

First Chow Decl. ¶ 1, and that Meteora "had no involvement in the [$LIBRA] project at all

beyond providing IT support, including commenting on the liquidity curve and helping verify the

token's authenticity after the token was publicly launched," Chow (@hellowchow), *supra*.  Even

the transcript of Respondent's call with cryptocurrency entrepreneur Moty Povolotski, which Petitioners highlight, *see* Reply at 2 & n.4, is consistent with Respondent's claim that his involvement with $LIBRA was limited to tech support.  *See* White, *supra* (Chow: "I just sort of, you know, help with tech support[.]"); *id.* (Chow: "I had red flags, but I never saw anything. And I always thought it was just external snipers.").  Petitioners speculate about what Respondent may have known, but cannot justify such sweeping discovery on this speculation. *See In re Novalpina Cap. Partners I GP S.À.R.L.*, No. 23-mc-00025 (PGG), 2025 WL 1160854, at *28 (S.D.N.Y. Apr. 21, 2025) (denying deposition request where petitioner offered no factual support for his claim that respondents had contact with certain individuals and would have relevant information, and assertion that respondents had past involvement with party to foreign proceeding was "insufficient to demonstrate that [respondents] possess[ed] information relevant to" claims); *In re Aguila*, 2024 WL 3650347, at *11 (fourth factor weighed against application where petitioner had "not shown that [respondent] ha[d] possession, custody, or control of [requested] documents," and thus the requests were "unduly burdensome and intrusive"); *In re Escallón*, 323 F. Supp. 3d 552, 560 (S.D.N.Y. 2018) (concluding section 1782 discovery request was "unduly intrusive or burdensome" in part because petitioner had made no showing that one respondent "ha[d] custody, control, or possession of the documents he seeks" and there was "an uncontroverted declaration from [that respondent] in the record, testifying that she does not have knowledge, possession, custody, or control of any documents related to [bank accounts and financial records]").  The Court also does not agree that Respondent's declarations are inconsistent or otherwise untrustworthy such that they should be disregarded as Petitioners suggest, *see* Tr. at 30:12-31:2, 31:10-16.

Finally, even if it would not be particularly onerous to respond to document requests if Respondent has no responsive documents, courts in this Circuit have still rejected section 1782 applications, "where 'a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable,' even where, as here, complying with the request has not been shown to be onerous."  *See In re Klein*, 2023 WL 8827847, at *14 (citation omitted) (quoting *United States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 97, 106-07 (S.D.N.Y 1979))).  Moreover, it would indeed be onerous for Respondent to sit for a deposition on the numerous topics presented.

For all of these reasons, the discovery Petitioners currently seek amounts to little more than a fishing expedition.  This factor weighs heavily against granting Petitioners' application. *See In re Auto-Guadeloupe Investissement S.A.*, No. 12-mc-00211 (RPP), 2012 WL 4841945, at *10 (S.D.N.Y. Oct. 10, 2012) ("If the [district court] . . . suspects that the request is a 'fishing expedition' or a vehicle for harassment, the district court should deny the request." (alteration and omission in original) (quoting *In re Request for Assistance from Ministry of Legal Affs. of Trinidad & Tobago*, 848 F.2d 1151, 1156 (11th Cir. 1988), *abrogated on other grounds by Intel*, 542 U.S. 241))); *see, e.g.*, *In re Bull Gaming N.V.*, No. 24-mc-80207, 2025 WL 770352, at *13 (N.D. Cal. Mar. 11, 2025) (denying section 1782 application seeking information about cryptocurrency transactions, in part because the applicant admitted that "the § 1782 application has a dual purpose — to obtain discovery for its use in the action [in a foreign tribunal] *and* to obtain information for unspecified 'potential actions,'" which suggested that the application was a fishing expedition).[6]

_____

[6] While Petitioners claim that the requests here are on all fours with information sought in other cases involving attempts to trace cryptocurrency flows, Reply at 6-7 (collecting cases), Respondent correctly points out that the cases they cite both involved *ex parte* section 1782

Given the degree to which the third and fourth *Intel* factors weigh against granting the Application, the Court denies the Application in its discretion.

## CONCLUSION

For the foregoing reasons, the Court DENIES the present application for section 1782 discovery from Respondent Chow.  The Clerk of Court is respectfully directed to close the case.

Dated: October 3, 2025
      New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge

---

applications where the respondent had not yet had an opportunity to raise any overbreadth or burdensomeness objections, nor did the courts consider Rule 26 constraints, Tr. at 41:17-22; *see In re Request for Int'l Judicial Assistance*, No. 23-mc-80250, 2023 WL 8242122, at *1, *4 (N.D. Cal. Nov. 28, 2023); *Laggner v. Parsa*, No. 22-mc-80328, 2023 WL 163579, at *1, *3 (N.D. Cal. Jan. 11, 2023).  Thus, neither case persuades the Court that such broad discovery is proper here under Rule 26 or *Intel*.